# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3878

_____

Gerald Biby,                                    *
                                                *
            Plaintiff - Appellant,              *
                                                *
    v.                                          *
                                                *
Board of Regents, of the University             *
of Nebraska at Lincoln; W. Darrell              *   Appeal from the United States
Nelson, in his Individual and Official          *   District Court for the District
Capacity; Donald Helmuth, in his                *   of Nebraska.
Individual and Official Capacity; John          *
Does, 1-10, in their Individual and             *
Official Capacities; Richard Wood;              *
Ken Cauble,                                      *
                                                *
            Defendants - Appellees.             *
                                                *
_____                 *
                                                *
American Civil Liberties Union                  *
Nebraska,                                        *
                                                *
    Amicus on Behalf of Appellant.              *

_____

Submitted:  June 20, 2005
Filed: August 22, 2005

_____

Before MURPHY, BYE, and SMITH, Circuit Judges.

_____

MURPHY, Circuit Judge.

After his employment as a technology transfer coordinator at the University of Nebraska at Lincoln was terminated, Gerald Biby sued its Board of Regents and several university officials. The district court[1] awarded summary judgment to the defendants on all claims, and Biby appeals its adverse ruling on two of them. He claims that his constitutional rights were violated by the search of his office computer and the university's failure to honor its technology licensing agreement (TLA) with a third party, thus depriving him of royalty income. We affirm.

Biby worked at the university's Industrial Agricultural Products Center (IAPC), which seeks to increase industrial and other nonfood uses of agricultural commodities. As a technology transfer coordinator for IAPC, Biby worked with private sector companies to identify research and marketing opportunities for new technologies. When negotiations for a project were successful, the agreement was formalized by the university's Office of Technology Transfer (OTT). That office also managed the university's policy on patentable discoveries resulting from work done for the university by its employees or developed with the use of university property or facilities. The policy provided that such discoveries were to be offered to the university in writing, and the institution would assume the costs of applying for a patent if it accepted the offer within six months. Royalties accrued from the use of the invention were to be divided between the inventor and the university, with the inventor receiving at least fifteen percent of the net revenues.

While he was employed at the IAPC, Biby worked with the director, Milford Hanna, and Qi Fang to develop horticultural applications for polylactic acid (PLA). Bill Brown, owner of Corn Card International, expressed an interest in using PLA to manufacture biodegradable plastic phone cards. Biby, Hanna, and Fang modified the

_____

[1]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska.

-2-

technology to suit that purpose and called it Soft Touch II. In March 1997 they offered the invention to the university, and a provisional patent application was subsequently filed. Donald Helmuth, the associate vice chancellor for research, filed a verified statement claiming nonprofit organization status with the Patent and Trademark Office and declaring that the "rights under contract or law have been conveyed to and remain with" the university with regard to Soft Touch II. The record before us does not contain either a formal acceptance or rejection by the university of the offer of invention made by Biby and the others.

In July 1997 the university entered into a licensing agreement or TLA with Corn Card. The TLA identified the university as the owner of the Soft Touch II technology and gave Corn Card the exclusive right to develop, market, and sell printable plastic phone cards incorporating the technology in the United States, Mexico, and Canada. Biby reports that he worked diligently with Brown to market the project successfully. In 1998 Brown began discussions with Gemplus, a card manufacturer interested in marketing cards using Soft Touch II technology in Europe. Brown and Gemplus hoped that the university would allow an assignment to Gemplus of Corn Card's rights under the TLA and that the marketing territory could be expanded worldwide. Biby was involved in making these plans with Gemplus and Corn Card, and he claims that he kept people at IAPC and OTT informed about them and that he was told that the assignment and market expansion would be approved. Biby further claims that no one at the university expressed opposition to the plans until after both Corn Card and Gemplus had made extensive financial investments in reliance on the initial approval of the project.

In February 1999 Corn Card threatened to take legal action against the university if it did not approve the Gemplus assignment, alleging that it would be in breach of the TLA. The dispute apparently centered on a claim made by Cargill, Inc. that it had an agreement with the university which accorded it ownership rights to the marketing of the PLA technology. Associate Vice Chancellor Helmuth directed

IAPC to give him all the information it had regarding Corn Card, and on March 5 it furnished him 975 pages of documents with an attached memo from Director Hanna. Hanna wrote that these documents represented "all the information regarding Corn Card, GemPlus [sic] and card related work" which IAPC had located but that they did not cover a joint meeting held with Helmuth or phone conversations with him. Helmuth and Darrell Nelson, dean and director of the agricultural research division at the university, instructed Biby several times in early 1999 not to contact Corn Card directly and told him that any communication with Corn Card must go through legal counsel. Biby reports that his relationship with Helmuth and Nelson became strained, and he acknowledges that he openly accused them of lying about the Corn Card and Gemplus project and of breaching the TLA. On April 16, 1999 Biby and the other inventors of Soft Touch II executed an assignment transferring their rights in the invention to the university.

In compliance with the terms of the TLA, the dispute between Corn Card and the university was submitted to arbitration. On May 19, 1999 the parties executed a document called Terms of Reference in which they agreed to provide each other all relevant nonprivileged documents by June 10. Helmuth told Biby in a telephone conversation on June 2 that the university needed to go through his computer files to make sure that it had all of the documents it was required to turn over. Helmuth added that pursuant to university policy Biby would have to sign a consent to search form and that a member of the university police department would need to witness the signing. Biby said that he would be uncomfortable having a police officer involved and asked Helmuth to fax him a copy of the university policy establishing this procedure. Helmuth faxed Biby a memo from Ken Cauble, who was the chief of the university police department, and a copy of the university policy on technology and networks. The memo from Chief Cauble stated that the "internal policy on the use of Consent to Search forms is that the rights of the individual can only be waived to a commissioned member" of the university police department. The university computer policy which Helmuth also faxed has a section on privacy. That section

states that the university will only search files if a legitimate reason exists, such as needed repair or maintenance of equipment, investigation of improper or illegal use of resources, and "response to a public records request, administrative or judicial order or request for discovery in the course of litigation." Consent to search forms are not mentioned, but the policy explicitly states that its terms are applicable to e-mail.[2]

When the university attempted to review Biby's paper and computer files on June 3, he videotaped the encounter. The first person to arrive at his office was an operations analyst, Micha Uher, who intended to go through his paper files. Biby said that he did not want any files leaving his office because he was concerned that their integrity would be compromised. He claimed that OTT was making IAPC the scapegoat in the dispute with Corn Card and said he would not participate in the destruction of evidence. Biby informed Uher that the 975 pages which IAPC had turned over to Helmuth had not included his personal notes and records or anything about Gemplus. He told Uher that he had not tried to withhold material, but that he was never asked for anything on Gemplus.

Computer specialist Anthony Spulak then arrived at Biby's office with a plainclothes officer. Spulak intended to search Biby's computer files after the officer first went over the consent form with him, but Biby refused to sign the consent form. He referred to the computer policy Helmuth had faxed and said that he assumed the search related to an investigation of improper or illegal use since there was no repair or maintenance issue. He said that he had been threatened, intimidated, and coerced by university officials and reiterated his concern about the integrity of his documents

---

[2]The record also contains another version of a computer policy which the university says has been available to all employees since it was implemented on January 5, 1998. This policy also lists "request for discovery in the course of litigation" as an exception to user privacy and explicitly applies to e-mail, but it does not mention consent to search forms.

being compromised. Spulak replied that he would not conduct a search without the signed consent, and he and the others departed.

That afternoon Biby met with Associate Vice Chancellor Helmuth, Dean Nelson, and Director Hanna. Nelson gave Biby a letter he had prepared which directed Biby "to provide immediate access to all business, licensing, tech transfer and research files, records, or communications relating to Corn Card International, whether in paper or electronic form, to University Operations Analysis and computer specialist personnel" so the university could turn over all documents for the arbitration. Biby said he understood that the university needed the files, and the others told him that the necessary files were those dealing with Corn Card, Gemplus, and Cargill. They also told him there had been a misunderstanding that morning because Uher was only to go through the paper files with Biby and to copy documents rather than remove them. They assured him that the computer specialist would not delete or alter files, but that he would need Biby to answer questions about his filing process and indicate which files might be relevant. Biby agreed to be present the following morning so that Uher and Spulak could collect paper and computer files.

Biby videotaped the first part of the file collection process on June 4. Uher arrived first, and Biby handed him paper files that had not been included in the 975 pages turned over in March. Biby told him these documents related to Gemplus or Cargill or were his personal notes, and Uher made copies of them. After Spulak arrived with a uniformed officer from the university police department, he told Biby that Richard Wood, vice president and general counsel for the university, had decided signed consent was not necessary to search his computer because the university owned it. Spulak also said he had been instructed to search through all files, to copy those related to the dispute, and to close any personal or irrelevant files. Biby asked Spulak and the officer if they thought these instructions were consistent with Dean Nelson's letter from the previous day. They both looked at Nelson's letter and replied

that they thought the instructions were consistent.  Biby then told Spulak, "You can start wherever you want."

Spulak said he wanted to start with the Lotus Notes e-mail files, and Biby logged in to allow him access.  Spulak conducted a key word search using terms related to the Corn Card dispute.  Spulak reports that he immediately closed any file that appeared not to relate to the dispute but e-mailed himself all of the files which appeared to be related to the arbitration so that he could deliver them to Helmuth.  Before Spulak was able to review the e-mail files Biby had retained on the Pegasus system, Biby complained that he was feeling ill.  Spulak says that he offered to return at another time to complete the search but that Biby indicated that he could forward all of the e-mail files to his own account.  Spulak says he later reviewed the e-mail and forwarded to Helmuth those files which appeared to be related to Corn Card.

The dispute between the university and Corn Card was settled in August or September 1999.  In September Dean Nelson placed Biby on paid administrative leave, alleging that Biby had misrepresented himself in his dealings with Corn Card and Gemplus as having authority to obligate the university contractually and that he had disobeyed the order not to contact Corn Card directly.  The dean met with Biby in October, and he was terminated on November 12, 1999.

Biby sued the Board of Regents and several university officers in their official and individual capacities on June 2, 2003.  The named individual defendants included Associate Vice Chancellor Helmuth, Dean Nelson, Vice President Wood, and Chief Cauble.  Biby sought lost wages and benefits, patent rights, past and future royalties, punitive and compensatory damages, attorney fees, and costs.  His second amended complaint alleged numerous federal and state causes of action, including claims for breach of contract, free speech violation, and tortious interference with a business relationship.

All counts were dismissed on summary judgment, and Biby's appeal concerns his claims under 42 U.S.C. § 1983 for violation of privacy guaranteed by the Fourth and Fourteenth Amendments and denial of due process guaranteed by the Fifth and Fourteenth Amendments. At the time of summary judgment the named defendants on these counts were Darrell Nelson, Donald Helmuth, and Richard Wood in their individual capacities, and the district court ruled that they were entitled to qualified immunity on the Fourth Amendment claim because they had not violated a clearly established constitutional right and a reasonable official would not have regarded their conduct to be unlawful. The court dismissed the due process claim after concluding that Biby had not established a property interest in either the patent or the TLA. It reasoned that any claim of coercion regarding the patent assignment would be barred by the state statute of limitations and that the TLA did not provide for royalty payments to Biby.

Our review of the district court's grant of summary judgment is de novo. Omni Behavioral Health v. Miller, 285 F.3d 646, 650 (8th Cir. 2002). "Summary judgment is warranted if the evidence, viewed in the light most favorable to the nonmoving party, shows that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." Bockelman v. MCI Worldcom, Inc., 403 F.3d 528, 531 (8th Cir. 2005). To survive a summary judgment motion based on qualified immunity, a plaintiff must assert a violation of a constitutional right, show that this right is clearly established, and raise an issue of material fact as to whether the defendant would have known that the conduct in question violated the clearly established right. Habiger v. City of Fargo, 80 F.3d 289, 295 (8th Cir. 1996).

Biby's Fourth Amendment allegations are that he had a constitutionally protected privacy interest in his work computer, that the university's reasons for searching his computer were illegitimate, and that the scope of the search was unreasonable. He relies on the Supreme Court's decision in O'Connor v. Ortega, 480 U.S. 709 (1987), which held in part:

[P]ublic employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances. Under this reasonableness standard, both the inception and the scope of the intrusion must be reasonable . . . .

Id. at 725-26. Biby denies that he consented to the search and claims that he was coerced into permitting it and that he only gave in when it became obvious he had no other choice.

Appellees respond that Biby did not have a reasonable expectation of privacy in his computer files because the university computer policy allows for searches when there is a discovery request in litigation. They contend that the university had legitimate reasons to search the computer files, the search was reasonable in scope, and Biby gave his consent to the search. Appellees argue further that they are entitled to qualified immunity because Biby has not demonstrated that he had a clearly established right of privacy or that they were on notice that their conduct violated his rights under the circumstances.

In O'Connor, the Supreme Court listed several factors which are relevant in determining whether an employee's expectation of privacy in the workplace is reasonable, and one such factor is the existence of a workplace privacy policy. See id. at 718-19. In both versions of the university computer policy in the record here, the computer user is informed not to expect privacy if the university has a legitimate reason to conduct a search. The user is specifically told that computer files, including e-mail, can be searched when the university is responding to a discovery request in the course of litigation. Although Biby contends that the university's true motivation for the search was to find a reason to fire him and to tamper with evidence, the record discloses that the search was conducted within the discovery period for the arbitration, that it used key words related to the arbitration, and that Biby was told in

advance that a search was necessary to locate documents related to the arbitration. A search of a government employee's office is justified under O'Connor "when there are reasonable grounds for suspecting that [it] . . . is necessary for a noninvestigatory work-related purpose." Id. at 726. Moreover, an official might reasonably have concluded from Biby's statements and conduct that he had consented to the search. In these circumstances we cannot conclude that it would have been clear to a reasonable official that his efforts to obtain the discovery materials were unlawful. See Saucier v. Katz, 533 U.S. 194, 202 (2001).

Biby complains that the key word search was unreasonably broad and that it yielded many personal or confidential files unrelated to the Corn Card project. He suggests that the search would have been reasonable if he had been allowed to sit down with the computer specialist conducting the search and review the files with him. A search is permissible in scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive." O'Connor, 480 U.S. at 726 (internal quotation marks and citation omitted). The record shows that the university needed to search broadly to ascertain that it had gathered all discoverable documents, and Biby was neither a party to the TLA nor a lawyer. Moreover, Biby has not contended that any term used was unrelated to the Corn Card project.

Biby has not shown that he had a reasonable expectation of privacy in his computer files, and even if he had met that threshold requirement of O'Connor, he has failed to show that the search of his computer was unreasonable in inception or scope. He has also failed to make a showing sufficient to overcome appellees' defense of qualified immunity, a defense at issue in this case but not in O'Connor. He has not demonstrated that a clearly established right of his was violated by the search or that a reasonable official would have known that the inception or scope of the search would violate Biby's Fourth Amendment rights. We conclude that the district court did not err in granting summary judgment on his Fourth Amendment claim.

-10-

Biby's due process claim as articulated in his second amended complaint is that the university's failure to abide by the TLA with Corn Card deprived him of benefits he was due as an owner of the patent to Soft Touch II technology. He recast his argument on appeal, however, and asserts that his status as an inventor of Soft Touch II gives him property rights to royalties. He concedes that he is not a party to the Corn Card TLA, but argues that the university's patent policy gives him an interest in it because the policy provides royalties to inventors. He also argues that this claim is not time barred even though he did not file his suit until June 2003. Biby contends that the four year statute of limitations in Neb. Rev. Stat. § 25-207(3) did not start to run in April 1999 when he assigned the patent to the university, but began in August or September 1999 when the university settled its dispute with Corn Card and precluded any possibility of royalty income.

In both statements of his due process allegations Biby's claim to a protectable property interest depends on the TLA between the university and Corn Card. Biby is not a party to that agreement, nor does the agreement acknowledge him as an inventor of the technology or an intended recipient of royalty income. To have an enforceable property right as a third party beneficiary under Nebraska law, the named parties to the contract must have contemplated the third party's rights and interests and provided for them. Spring Valley IV Joint Venture v. Neb. State Bank of Omaha, 690 N.W.2d 778, 782 (Neb. 2005). The TLA did not obligate either party to disburse royalty funds to Biby, making him at most an incidental beneficiary without enforceable rights. See id. at 783. That he might have had a claim to ownership in the patent or a separate agreement for royalties with the university is immaterial in this respect. Without a cognizable property interest in the TLA, Biby's due process claim must fail. We conclude that the district court did not err by dismissing this claim.

For these reasons the judgment of the district court is affirmed.

-11-

BYE, Circuit Judge, concurring.

To the extent the majority opinion can be read to disavow Gerald Biby's expectation of privacy in his computer, I disagree. The University's privacy policy created an expectation the contents of his computer are to a certain degree private. The policy specifically states "a user can expect the files and data he or she generates to be private information." In addition to the policy, the fact his computer was password protected and located in his private office is further evidence of the heightened expectation of privacy. He also regularly used his computer for personal use, his e-mail for personal correspondence, and he kept highly confidential proprietary information in his computer. Moreover, the University acted as if he had an expectation of privacy in his computer by requiring him to consent to a search. Based upon these facts, I submit Biby had an expectation of privacy in his office computer. Nevertheless, because the University's need to gather information relevant to a pending arbitration outweighed Biby's privacy interests, I would find the search of the computer reasonable, and not in violation of the Fourth Amendment.

_____