# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1086

_____

Arthur Dale Senty-Haugen,                    *
                                             *
    Plaintiff - Appellant,                   *
                                             *
    v.                                       *
                                             *
Kevin Goodno, Michael Tessner,               *
Larry Tebrake, Jerry Zimmerman,              *
Steve Huot, Dr. David Paulson,               *
Tom Kramer, Dara Johnson, Paula              * Appeal from the United States
Johnson, Lori Parkos, Deborah                * District Court for the
Konieska, Jim Lind, Barry Anderson,          * District of Minnesota.
Al Langhorst, Brian Nieneman, Brett          *
Skog, Mary Eckstine, Kurt Eckstine,          *
Carol Roback, Lorilee Aldrin,                *
Mary Long, Mary Lichtenberg,                 *
Pam Bidelman, Dean Mooney, Randy             *
Valentine, Richard O'Connor, Robert          *
Rose, Mary Lou Foss-Salo,                    *
John Doe, Jane Roe,                          *
                                             *
    Defendants - Appellees.                  *

_____

Submitted: June 12, 2006
Filed: September 11, 2006

_____

Before MURPHY, MELLOY, and COLLOTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

Arthur Dale Senty-Haugen was committed as a sexual psychopathic personality and sexually dangerous person to the custody of the Minnesota Sex Offender Program (Offender Program). Senty-Haugen brought this action against the Commissioner of the Minnesota Department of Human Services, other officials of the department, and employees of the Offender Program, alleging violations of federal and state law for being placed in isolation, receiving inadequate medical attention, and being retaliated against. The district court[1] granted summary judgment to the defendants, and Senty-Haugen appeals. We affirm.

I.

In 1996 Senty-Haugen was indefinitely committed as a sexual psychopathic personality and sexually dangerous person, pursuant to Minnesota Statute §§ 253B.02, subds. 18b, 18c; 253B.185, and was placed in the custody of the Offender Program.[2] The Offender Program operates at two Minnesota sites, one in St. Peter and the other in Moose Lake. Defendant Michael Tessner is the Chief Executive Officer of State Operated Services, the Department of Human Services division that administers and oversees the Offender Program.

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

[2]His placement was ordered by the state district court which made findings of fact that Senty-Haugen had sexually assaulted seven minors beginning when he was 18 or 19 years old. The court also found that Senty-Haugen had engaged in repeated sexual acts with his adopted brother, a vulnerable adult living in foster care, and that Senty-Haugen had engaged in sexual conduct with another Offender Program patient while the state's commitment petition was pending.

The Offender Program is responsible for providing treatment to several hundred patients[3] in the State of Minnesota who have been committed to its custody. A patient is committed to the Offender Program if the state district court finds by clear and convincing evidence that the patient is a sexual psychopathic personality and sexually dangerous person evidencing "an utter lack of power to control . . . sexual impulses" and who "is likely to engage in acts of harmful sexual conduct." Minn. Stat. §§ 253B.02, subds. 18b, 18c; 253B.18, subd. 1.  Patients can seek release from the program by filing for provisional or full discharge to a special review board that makes recommendations to the Commissioner of Human Services. Minn. Stat. § 253B.18, subds. 4c, 5.  A patient aggrieved by the Commissioner's decision may petition a judicial appeal panel for rehearing, Minn. Stat. § 253B.19, subd. 2, and later the Minnesota Court of Appeals. Minn. Stat. § 253B.19, subd. 5.

The Offender Program has promulgated Minnesota Sex Offender Program Procedures to govern patients committed to its custody.  If a patient is suspected of breaking a rule, an operational team of at least two staff members meets to determine whether a violation has occurred and what consequences to impose.  A patient facing behavioral restrictions is permitted to attend the operational team meeting. Operational teams impose level B restrictions for rule violations that do not have the potential to harm the patient or others and level A restrictions for conduct that does have the potential to cause harm.  A patient on Level B restrictions is restricted from walking to outer portions of the facility, visiting other rooms, purchasing outside food, or using non essential community items.  Patients on Level A restrictions receive additional limitations on telephone calls and areas they can visit.  Patients can file grievances challenging the imposition of their restrictions to the unit director, patient advocate, and director.  Patients can also seek review by the advisory hospital review board.

---

[3]Counsel estimated during oral argument that approximately 300 patients are in the custody of the Offender Program.

-3-

The Department of Human Resources has promulgated Minnesota Rule 9515.3090 to authorize Offender Program staff to place patients in protective isolation "as a way of defusing or containing dangerous behavior that is uncontrollable by any other means." subp. 4. The use of protective isolation is never to be used "for the convenience of staff or as a substitute for programming", and treatment must be available during protective isolation "to the extent that the person's behavior and condition make treatment possible." Id. at subps. 4A, 4B. The Rule limits protective isolation to 48 hours unless there is a statement from a treatment team to the medical director that continued protective isolation is necessary and the medical director has consented to continued placement in protective isolation. Id. at subp. 4C. A patient in protective isolation is permitted to seek review of the decision by a panel of at least three persons who were not participants in the decision to impose isolation and to request that the chief officer of the facility review the review panel's decision. Id. at subp. 5A-D. A patient is permitted to "present to the review panel evidence and argument to explain why protective isolation is unwarranted." Id. at subp. 5C.

The Offender Program has implemented its own Minnesota Sex Offender Program Procedure governing the use of protective isolation. In addition to the requirements of Rule 9515.3090, the internal procedures require that a patient receive a copy of a protective isolation assessment report within 2 hours of being placed there, that a protective isolation review panel and clinical director approve any decision by the assessment team to keep a patient for more than 48 hours, and that use of protective isolation for more than 7 days must be approved by the clinical director prior to the end of each 7 day period. Patients are permitted to appeal a review panel decision to the program director who is to appoint an appeal panel consisting of two objective persons. The internal procedures also require that protective isolation be limited to 7 consecutive days unless the use of isolation is reviewed by the hospital review board. Formal rules of evidence do not apply to the hospital review board meeting, but the patient is permitted to question any person appearing before the board. The clinical director is required to respond in writing to the review board's

-4-

recommendation and state in writing the reasons for modifying or rejecting any recommendation.

The Offender Program has also formulated a grievance procedure enabling patients to express and resolve complaints. The procedure allows patients to file grievances and requires staff to respond to all grievances as soon as possible and generally within 3 business days. Patients seeking further review of their grievance may forward their grievance to the patient advocate who can forward it to the hospital review board, office of the ombudsman for mental health and retardation, office of health facility complaints, or the Department of Human Rights. Patients also maintain the right to contact the hospital review board, the office of the ombudsman, the office of health facility complaints, and the Department of Human Services Civil Rights Department.

II.

A.

Prior to being admitted to the Offender Program in 1996, Senty-Haugen had been incarcerated in a state prison for criminal sexual conduct. In 1999 he was returned to prison after being convicted of fraud and theft crimes committed while he was a patient in the Offender Program. When he was released from prison in May 2002, he returned to the Offender Program facility in St. Peter for continuing treatment.

At the time Senty-Haugen was readmitted to St. Peter, he reported with a number of medical conditions, including coronary artery disease, hypertension, and hemorrhoids. On August 1, 2002, he told a nurse that he had been experiencing chest pains and that a nitroglycerin tablet taken at 1:45 a.m. had not helped. The nurse gave him additional tablets and notified a doctor, who requested that an ambulance take

him to the hospital. At 2:38 a.m. staff could not locate a pulse, but they were able to resuscitate him with oxygen. The ambulance arrived at 3:00 a.m. and took him to the hospital. He was then airlifted to Minneapolis where he was given a coronary and left ventricular angiogram. The results were negative, and he was taken back to St. Peter that day.

Senty-Haugen committed numerous disciplinary infractions at St. Peter. On January 23, 2003 he was found in violation of Offender Program regulations which limit the amount of money a patient can possess to $71 (he had given a taxi driver $225 to deliver to a bondsman). As a result, an operational team meeting was convened and staff searched his room. They found marijuana and a cell phone, both of which were prohibited by Offender Program policies. After Senty-Haugen tested positive for marijuana use, an operational team imposed 105 days of Level A restrictions in addition to the 90 days that had been imposed because of the other rule infractions.[4]

In the summer of 2003 staff grew concerned that he had been financially exploiting an elderly patient (Patient X), and Unit Director Gary Grimm decided to transfer Patient X to a different room to reduce his contact with Senty-Haugen. Senty-Haugen was a member of the Resident Advisory Council, and he organized other patients in resistance to the transfer, relying on a provision in the Minnesota Patients Bill of Rights that requires health care facilities to provide patients 7 days notice of a room transfer unless the transfer is done for circumstances outside of the facility's control. Because of the patient resistance Grimm decided to delay the room transfer. Six days later he was assaulted when he was asleep at his home and beaten with a baseball bat.

---

[4]Senty-Haugen stated in his deposition that he was only subject to 90 days of level A restrictions because the unit director considered the operational team's punishment of over 200 days to be excessive.

Because of staff fears that Senty-Haugen had been taking financial advantage of Patient X and that he had ordered the assault on Grimm, he was transferred to the Offender Program facility in Moose Lake on October 2, 2003. He did not receive notice prior to being transferred, and staff discovered among his belongings a power of attorney document giving him control of Patient X's financial affairs and a will naming him as Patient X's residual beneficiary. The will had been notarized by his father, Dale Senty-Haugen. During the transfer to Moose Lake, Senty-Haugen removed his restraints and threatened the transport officers by telling them that people "get hurt and burned" as a consequence of their behavior (one of the transport officers had previously been burned by hot oil poured on him by another patient).

Upon his arrival at Moose Lake, Senty-Haugen initially refused to consent to a strip search. Staff later observed him having lengthy conversations on two telephones simultaneously and giving sealed envelopes to other patients. An operational team met with him on October 3, 2003 to review the circumstances leading to his transfer. Although the team imposed 30 days of Level A restrictions and limited his use of the mails, he was permitted to make four outgoing calls per day and to communicate with his attorney. Senty-Haugen attempted to circumvent the restrictions by filing change of address notices which listed his father's address as his own and by asking other patients to receive and make phone calls for him.

Senty-Haugen was placed in protective isolation on October 9, 2003 and within hours received notice of the basis for his placement. Michael Tessner, the chief executive officer of the division administering the Offender Program, had determined that Senty-Haugen presented an imminent risk to the safety of staff and other patients. Tessner was aware that Senty-Haugen was subject to ongoing criminal investigations into his involvement with Patient X's finances and the assault on Grimm, and he made the decision to place Senty-Haugen in isolation after a video conference with Larry Tebrake, the Offender Program site director in Moose Lake, Jerry Zimmerman, the chief operating officer of the Offender Program, and other officials.

A review panel consisting of at least two of the Offender Program officials who had been present for the video conference met the following day with Senty-Haugen and discussed the placement. After that meeting the review panel approved the placement. On October 15 Tessner circulated a memorandum stating that the conditions of protective isolation could also be used to ensure that a patient suspected of criminal activity not have the ability to continue it or to cause harm to other patients, staff, or the public. The memorandum gave the site director the discretion to determine whether imposition of isolation is necessary and to decide when it is safe to remove a patient from isolation. Senty-Haugen remained in isolation pursuant to this memorandum.

While Senty-Haugen was in isolation he had at least five hearings before the hospital review board, and he and his attorney appeared before the board at each meeting.[5] On October 16 the board approved the use of isolation for ten additional days. Later the board recommended that the use of isolation be discontinued (on October 27, December 4, January 5, and February 6, 2004), and no written response was issued by Offender Program officials. Throughout this period Senty-Haugen was able to contact his attorney as well as the Ombudsman for Mental Health and Mental Retardation. He was also able to file grievances, and a review panel of Offender Program staff met with Senty-Haugen on two additional occasions to determine whether isolation should be continued.

Shortly after Senty-Haugen was placed in isolation, staff learned that other patients had received calls and letters from him. A facilities wide search was conducted on October 30. Staff discovered a cell phone in the isolation unit mattress and a charger in Senty-Haugen's room. After staff located and removed the phone, Senty-Haugen reacted with violent kicks to the door of his room, twice triggering the

_____

[5] The record is unclear whether there were five or six hearings. Although there are minutes dated March 6, 2004, they are identical to those for the meeting held on February 6, 2004.

door alarm. Eventually he called staff to complain that he had broken his leg. Since he was not visible to staff from the window in the top half of the room door, they were afraid to enter the room or to open the cuff port (a rectangular opening in the bottom half of the door). After Senty-Haugen crawled to the other side of the room where he could be seen, staff entered and ordered an ambulance to take him to the hospital where he had surgery on his leg on November 7. He was then returned to the Moose Lake facility with a knee brace.

Senty-Haugen also experienced problems with an anal cyst in November 2003. He was prescribed Keflex and hot packs, but he complained to the duty nurse that they did not ease his pain and asked that she lance the cyst. She declined so he lanced it himself. The following day a staff member met with him to discuss his behavior and the grievance procedure. Between October 2, 2003 and November 17, 2004, Senty-Haugen had filed 205 grievances regarding his care. He was referred to a surgeon regarding the cyst in December of 2003, and it was removed in February 2004.

Offender Program officials gradually decreased the severity of the restrictions, granting Senty-Haugen additional access to television and the courtyard and allowing him to purchase items from the canteen and to call his children on Christmas Eve. He also was given access to treatment materials and therapy in the latter period of isolation. He declined to take part in therapy because he did not want to speak to the counselor assigned to him, and he did not attend group therapy because he was restricted from complaining there about the circumstances leading to his isolation.

Senty-Haugen was removed from isolation on March 12, 2004. According to Tebrake, the Moose Lake site director, he was released because he, Tessner, and Steve Huot, the clinical director of the Offender Program, had learned that no criminal charges were going to be filed against Senty-Haugen for the St. Peter incidents and because he had not violated any Offender Program policies since October 30. After his release officials continued to limit his phone, internet, mail, and visiting privileges

to prevent contact with Patient X. He was also placed on 2 days of Level A restrictions on April 6 for passing items to other patients without prior approval and two additional days for verbally abusing staff during the April 6 operational team meeting. A team also imposed three days of Level A restrictions on April 10 for using the laundry room without prior approval. Senty-Haugen received 11 more days of Level A restrictions on April 30 after he engaged in threatening behavior toward staff members.

Senty-Haugen was again placed in isolation on November 16, 2004 after a thirty count federal indictment was filed. The indictment charged him with creating fictitious entities and stealing social security numbers to commit tax fraud, and he was taken into federal custody on November 18, 2004. Based on his guilty plea to five counts of filing false tax claims and one count of conspiracy to defraud the federal government, he was sentenced to 57 months imprisonment. State authorities meanwhile charged him with additional offenses for making transfers to his credit card from Patient X's checking account while in federal custody.[6]

While Senty-Haugen was still a patient in the Offender Program, it assessed him a daily charge of $282.60 for providing his care. Senty-Haugen responded with an affidavit stating that he had no monthly income, and that he possessed approximately $27,000 in total assets. He also stated that he was unwilling to sign authorizations, consent forms, or financial information forms because they infringed on his statutory and privacy rights. The Offender Program has not collected any of the amount charged.

---

[6]Senty-Haugen states in his reply brief that the state charges were later dismissed.

B.

Senty-Haugen filed this lawsuit against 28 named and two unknown defendants, including the Commissioner and unknown employees of the Minnesota Department for Human Services, and Offender Program administrators and staff, alleging negligence and violation of the federal and state constitutions and state statutes. He seeks injunctive and declaratory relief as well as attorney fees and two million dollars in damages. Defendants moved for summary judgment, arguing that the measures taken in response to his conduct were necessary because of the risk to safety he posed, that they had exercised professional judgment in their decisions and treatment, and that in the alternative they were entitled to qualified immunity. Senty-Haugen countered that genuine issues of material fact precluded entry of summary judgment, relying on an affidavit of a certified sex therapist that placement in isolation for approximately 150 days is substandard care and would not be accepted by the treatment community at large.

The district court granted the summary judgment motion, concluding that the defendants had not violated Senty-Haugen's constitutional rights and that he had failed to comply with the requisite statutory requirements for bringing a medical negligence claim. His claims for injunctive and declaratory were moot the court decided, and the defendants were entitled to qualified immunity because their care had not violated clearly established rights.

Senty-Haugen appeals, arguing that there are genuine issues of material fact supporting his claims that the decision to keep him in isolation without adequate process violated his right to due process, that the medical treatment he received was deliberately indifferent to his medical needs, and that the Offender Program officials had infringed on his rights to counsel and free speech. He also asserts that the appellees infringed on his due process rights by charging him for the costs of his treatment and that the district court failed to address this argument. Finally, Senty-

Haugen maintains that he satisfied the state law requirements for bringing a negligence action and that the district court erred by holding that his claims for declaratory and injunctive relief were moot. Appellees respond that the treatment he received was reasonable given the risk he presented to other patients, that Senty-Haugen presented no evidence that his medical care was deliberately indifferent to his needs, and that he failed to present evidence supporting his other claims. They also counter that they are entitled to qualified immunity, that the claims for injunctive and declaratory relief are moot because Senty-Haugen is currently in federal custody, and that he is liable by statute for the costs of his care.

We review a grant of summary judgment de novo, taking the evidence in the light most favorable to the non moving party. Larson v. Kempker, 414 F.3d 936, 939 (8th Cir. 2005).

## III.

### A.

Senty-Haugen asserts that his placement in isolation infringed on a protected liberty interest in violation of his procedural due process rights under the Fourteenth Amendment because he was not afforded adequate process when he was placed and kept in isolation. His complaint did not allege a violation of substantive due process rights, and counsel affirmed at oral argument that this is a procedural due process case. Appellees assert that Senty-Haugen received adequate process, and in the alternative that they are entitled to qualified immunity because any right to additional procedures was not clearly established.

A procedural due process claim is reviewed in two steps. The first question is whether Senty-Haugen has been deprived of a protected liberty or property interest. Dover Elevator Co. v. Arkansas State Univ., 64 F.3d 442, 445-46 (8th Cir. 1995).

Protected liberty interests "may arise from two sources – the Due Process Clause itself and the laws of the States." Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989). If he does have a protected interest, we then consider what process is due by balancing the specific interest that was affected, the likelihood that the Offender Program procedures would result in an erroneous deprivation, and the Offender Program interest in providing the process that it did, including the administrative costs and burdens of providing additional process. Mathews v. Eldridge, 424 U.S. 319, 332-35 (1976).

Since appellees concede that placement of Senty-Haugen in isolation and restricting his contact with others implicated a protected liberty interest, the basic issue is what process is due to protect that interest.[7] See Parrish v. Mallinger, 133 F.3d 612, 615 (8th Cir. 1998) ("A procedural due process claim focuses not on the merits of a deprivation, but on whether the State circumscribed the deprivation with constitutionally adequate procedures").

Neither the Supreme Court nor this court has determined the extent to which the Constitution affords liberty interests to indefinitely committed dangerous persons under the Mathews balancing test. Since Senty-Haugen has been civilly committed to state custody as a dangerous person, his liberty interests are considerably less than those held by members of free society. See Wilkinson v. Austin, 125 S.Ct. 2384, 2395-96 (2005); Morrissey v. Brewer, 408 U.S. 471, 481 (1972). As compared to a prison inmate, however, Senty-Haugen was entitled to "more considerate treatment and conditions of confinement". Youngberg v. Romeo, 457 U.S. 307, 322 (1982).

---

[7]Senty-Haugen also complains that he was deprived of other freedoms, including access to the canteen and outside vendors and computer privileges. These are *de minimis* restrictions "with which the Constitution is not concerned", however. Bell v. Wolfish, 441 U.S. 520, 539 n.20 (1979); see also Smith v. Copeland, 87 F.3d 265, 267-69 (8th Cir. 1996).

The Minnesota program for civil commitment of dangerous persons like Senty-Haugen to state custody and the accompanying curtailment of their liberty interests is constitutionally permissible. Poole v. Goodno, 335 F.3d 705 (8th Cir. 2003). The nature of Senty-Haugen's liberty interest in being free from isolation must therefore be understood in the context of that commitment and its accompanying restrictions. See, e.g., Wilkinson, 125 S.Ct. at 2395-96; Morrissey, 408 U.S. at 481. Senty-Haugen argues that his interest in remaining within the general patient population had additional weight because he was deprived of treatment while in isolation which could have contributed to his eventual release from the custody of the Offender Program. See, e.g., McKune v. Lile, 536 U.S. 24, 38 (2002); Sandin v. Conner, 515 U.S. 472, 487 (1995).

Not only was Senty-Haugen unreceptive to the treatment opportunities available to him during the latter period of his isolation, but he has not presented evidence that he would have been any more receptive to treatment when he was initially placed there.[8] Senty-Haugen also has not shown that treatment would have decreased the need for continued isolation, and there is no basis in the record to determine at what point he might be released from the Offender Program, regardless of whether he had treatment throughout his isolation period. Added to that is the fact that he is currently serving time in federal prison. The possibility that his period of isolation could lengthen his stay in the Offender Program is "too attenuated" to invoke further due process protections. Sandin, 515 U.S. at 487.

The second and third Mathews factors address the risk that Senty-Haugen could have been kept in isolation for improper reasons under the procedures used, the availability of additional safeguards that could have minimized the risk of such an occurrence, and the state's interest in implementing the procedures utilized. Bohn v.

---

[8] We note that Minnesota Rule 9515.3090 requires treatment be available for patients in isolation "to the extent that [their] behavior and condition make treatment possible".

-14-

Dakota County, 772 F.2d 1433, 1436-39 (8th Cir. 1985). Senty-Haugen remained in isolation based on the determination of multiple Offender Program officials that it was necessary to provide for the safety and security of other patients and to allow the criminal investigations into his activities to progress without interruption. The safety of the facility is one of the key responsibilities of Offender Program officials, and judgment in this area relies heavily on "subjective evaluations . . . and predictions of future behavior". Connecticut Bd. of Pardons v. Dumschat, 452 U.S. 458, 464 (1981). Because the use of isolation is a discretionary decision based on subjective factors, it is unlikely that more formal, trial like procedures would aid the determination. See Hewitt v. Helms, 459 U.S. 460, 473-74 (1983). Moreover, federal courts are to give deference to state officials managing a secure facility, and Offender Program staff have a substantial interest in providing efficient procedures to address security issues. See Sandin, 515 U.S. at 482, Youngberg, 457 U.S. at 321-22; Bell, 441 U.S. at 539.

Senty-Haugen argues, nonetheless, that the procedures governing his placement in isolation were constitutionally insufficient because Offender Program officials created the policy governing his placement in isolation specifically for him. He also asserts that appellees violated statutes and regulations. These included those pertaining to his right to communicate with others and requirements that a review panel be comprised of individuals not involved in the original isolation decision, that officials respond in writing to the board's recommendations, and that placement in isolation be periodically reviewed and approved by specific officials.

Although state statutes and regulations can give rise to constitutionally required procedural protections in certain circumstances, see Morgan v. Rabun,128 F.3d 694, 699 (8th Cir. 1997), they "cannot dictate what procedural protections must attend a liberty interest - even a state created one". Swipies v. Kofka, 419 F.3d 709, 716 (8th Cir. 2005). The requirements of due process are "flexible" and specific to each "particular situation", Mathews, 424 U.S. at 334, and the fact that officials

implemented a new isolation policy geared toward the unique problems caused by Senty-Haugen's conduct does not amount to a procedural due process violation.

The most important mechanisms for ensuring that due process has been provided are "notice of the factual basis" leading to a deprivation and "a fair opportunity for rebuttal". Wilkinson, 125 S.Ct. at 2396. Senty-Haugen received notice of why he was placed in protective isolation immediately after that placement, and he had the opportunity to rebut the rationale at the review panel meeting the following day. During the period he was in isolation he and his attorney had the opportunity to present his position to the hospital review board and Career Offender officials at all five or six board meetings, an internal review panel met on three occasions to discuss whether his isolation should be continued, and he always had the ability to contact his attorney and file grievances. See Id.; Hewitt, 459 U.S. at 474, 477 n.9 (finding that an "informal, nonadversary" proceeding with "periodic review" provides sufficient due process for placement of a prison inmate in segregation pending investigation of misconduct charges).

Given that Senty-Haugen's liberty interest was limited because he had been indefinitely committed to state custody, Morrissey, 408 U.S. at 481, that he received the "fundamental requisite[s]" of due process - notice and a right to be heard, Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950), that the decision to use isolation was a discretionary, subjective decision by state officials, Dumschat, 452 U.S. at 464, and that appellees have a "vital interest" in maintaining a secure environment, Morgan, 128 F.3d at 697, we conclude he has not shown that appellees violated his due process rights.

Even if we were to conclude that Senty-Haugen was entitled to enhanced procedural protections, state officials performing discretionary functions are entitled to qualified immunity so long as their conduct does not infringe on "clearly established" constitutional rights "of which a reasonable person would have known".

-16-

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Reasonover v. St. Louis County, MO, 447 F.3d 569, 580 (8th Cir. 2006). Senty-Haugen fails to cite any decision from the Supreme Court or federal circuit courts establishing that he was clearly entitled to other procedural safeguards. He does cite West v. Schwebeke, 333 F.3d 745 (7th Cir. 2003), but that case is inapposite. West involved a substantive due process challenge to the placement of civilly committed sexually violent persons in cells with primitive conditions,[9] rather than a challenge to the adequacy of procedures used for isolating someone for security purposes. Id. at 747. We conclude that appellees are entitled to qualified immunity under these circumstances. Smook v. Minnehaha County, 457 F.3d 806, 813-14 (8th Cir. 2006); see also Moore v. Carpenter, 404 F.3d 1043, 1046-47 (8th Cir. 2005).

Senty-Haugen argues that his claims for injunctive and declaratory relief remain viable even if appellees are entitled to qualified immunity. Equitable remedies are, however, not available "absent a showing of irreparable injury". Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985). Senty-Haugen's period of isolation ended before he began serving his current prison sentence and there is no reasonable expectation that he will be placed in isolation upon his release from federal custody. See Smith v. Hundley, 190 F.3d 852, 855 (8th Cir. 1999) (dismissing as moot first amendment claim for declaratory relief after prisoner was transferred to a different prison). His claims for injunctive and declaratory relief in respect to his isolation are thus moot.

## B.

Senty-Haugen asserts that the district court overlooked his claim that he is entitled to injunctive and declaratory relief because the state infringed his due process

---

[9]As a means of "therapeutic seclusion" these patients were placed in a cell with only a concrete bed, toilet, and sink. They were often left without clothes and only allowed out in shackles one hour a day during the week and never on weekends. West, 333 F.3d at 747.

rights by charging him for the costs of his treatment. He asserts that the Offender Program is not an accredited treatment facility and that the requirement that he pay for his care is an infringement of his rights because the treatment given was unconstitutional, it did not provide him with a meaningful opportunity for rehabilitation, and the costs were assessed without adequate procedures to determine his ability to pay. Appellees respond that Senty-Haugen failed to provide the information necessary to determine his ability to pay and that the state has yet to collect any payment from him so there has been no cognizable deprivation of a protected property interest.

Since the state has not attempted to collect any money from Senty-Haugen, he has yet to suffer a cognizable loss. Article III of the Constitution limits federal courts to the resolution of "cases" and "controversies", and the ripeness doctrine avoids "wasting scarce judicial resources in attempts to resolve speculative or indeterminate factual issues." In re Bender, 368 F.3d 846, 848 (8th Cir. 2004). Senty-Haugen's argument that it would be unconstitutional for the state to commence an action to collect payment from him for his treatment is speculative and too premature for review. See Koscielski v. City of Minneapolis, 435 F.3d 898, 903 (8th Cir. 2006). His claim related to the imposition of costs for his treatment should therefore be dismissed without prejudice.

C.

Senty-Haugen argues that there is a genuine factual dispute as to whether the medical treatment he received for his health conditions was in deliberate indifference to his medical needs. Appellees respond that Senty-Haugen presented no evidence establishing that his treatment was inadequate or that the treatment contributed to his injuries. They also assert that they are entitled to qualified immunity on these claims.

To make out a violation of the Eighth Amendment prohibition against cruel and unusual punishment arising from inadequate medical attention, an inmate must show "deliberate indifference" to a "serious illness or injury". Estelle v. Gamble, 429 U.S. 97, 105 (1976). The parties agree that the Eighth Amendment is not applicable to this claim because Senty-Haugen was not a prisoner. Although this claim thus falls under the due process clause of the Fourteenth Amendment, the deliberate indifference standard remains applicable. See Davis v. Hall, 992 F.2d 151, 152-53 (8th Cir. 1993); Terrance v. Northville Regional Psychiatric Hosp., 286 F.3d 834, 842-43 (6th Cir. 2002). Deliberate indifference is a higher standard than gross negligence, St. Cloud v. Weber, 433 F.3d 642, 646 (8th Cir. 2006), and Senty-Haugen must prove that officials knew about excessive risks to his health but disregarded them, Logan v. Clarke, 119 F.3d 647, 649 (8th Cir. 1997), and that their unconstitutional actions in fact caused his injuries. Calloway v. Miller, 147 F.3d 778, 781 (8th Cir. 1998).

Senty-Haugen asserts that the state officials delayed treatment to his heart condition, broken leg, and inflamed cyst, and that the delay amounted to deliberate indifference to his medical needs sufficient to avoid summary judgment. He also argues that the officials violated his constitutional rights by making him crawl across his room with a broken leg. Senty-Haugen has failed to present any evidence that the alleged delays in treatment worsened his conditions, however, and he has not provided any expert evidence that the treatment he received was inadequate. Coleman v. Rahija, 114 F.3d 778, 784 (1997) (the failure to establish "the detrimental effect of delay in treatment precludes a claim of deliberate indifference"). Although he was forced to move away from the door of his room before he could be treated for his leg, the actions of the staff were not unreasonable since they were unable to ascertain the extent of his injury until it was clearly safe for them to enter. The district court did not err by granting summary judgment in favor of the defendants on this claim.

D.

Senty-Haugen asserts that appellees retaliated against him in violation of his first amendment rights by transferring him after he advocated on behalf of Patient X and by retaliating against him after he filed other grievances and complained about his care in isolation. Appellees respond that there is no evidence supporting his claims. They also assert a qualified immunity defense.

To prevail on his retaliation claim that he was transferred because of the exercise of his first amendment rights, Senty-Haugen must show that "but for" his objections to Patient X's transfer and his grievances he would not have been transferred to Moose Lake and that "a desire to retaliate was the actual motivating factor behind the transfer." Goff v. Burton, 91 F.3d 1188, 1191 (8th Cir. 1996). Offender Program officials introduced evidence that they transferred him to lessen his contact with Patient X, and Senty-Haugen fails to present any evidence that the transfer took place for any other reason. A reasonable fact finder could not find from the evidence that the transfer took place in retaliation for Senty-Haugen's speech, and the district court did not err by granting defendants summary judgment on this claim. See Ponchik v. Bogan, 929 F.2d 419, 420 (8th Cir. 1991).

Senty-Haugen also asserts that Offender Program staff retaliated against him for filing grievances and for contacting his attorney by further restricting his speech and by leaving the lights on in the protective isolation unit. Offender Program officials determined that it was not safe for Senty-Haugen to have unrestricted contact with patients and his family members because they feared that he was enlisting their aid in exploiting other patients and suspected that he had ordered the assault on Grimm. These fears arose after Senty-Haugen made threatening comments to Offender Program officials and after he was observed simultaneously using multiple phone lines and passing sealed letters to other patients. Officials had twice found a prohibited cell phone in his possession and had located a revised will for Patient X

that named Senty-Haugen as the beneficiary and that had been notarized by his father. There is overwhelming evidence that the restrictions on Senty-Haugen's speech were related to security concerns, and he fails to present any evidence other than his unsupported allegations that the restrictions were in place in retaliation for his filing grievances or communicating with his attorney or that officials retaliated against him in any manner for the exercise of his first amendment rights. de Llano v. Berglund, 282 F.3d 1031, 1035 (8th Cir. 2002). The district court did not err by granting summary judgment to appellees on this claim.

E.

Senty-Haugen also contends that appellees interfered with privileged communications with his attorney by reading their correspondence. His contention is unsupported by anything other than his own allegations, however, and he fails to present evidence that staff read or opened any correspondence that was marked attorney client privilege. See Gardner v. Howard, 109 F.3d 427, 430-31 (8th Cir. 1997) (finding that unsupported assertions in an affidavit cannot defeat a summary judgment motion and that isolated, inadvertent instances of legal mail being opened outside of an inmate's presence is not actionable); Harrod v. Halford, 773 F.2d 234, 236 (8th Cir. 1985); Jensen v. Klecker, 648 F.2d 1179, 1182-83 (8th Cir. 1981). The district court did not err by awarding summary judgment.

F.

Senty-Haugen also argues that he is entitled to damages because appellees breached their duty to exercise a reasonable standard of care in regard to the treatment provided for his mental health condition. Appellees respond that summary judgment is appropriate, asserting that Senty-Haugen failed to fulfill the requirements for bringing a state medical malpractice cause of action and that they are entitled to statutory and official immunity on this claim.

To prevail on a claim of medical malpractice in Minnesota, a plaintiff must establish "(1) the standard of care recognized by the medical community as applicable to the particular defendant's conduct, (2) that the defendant in fact departed from that standard, and (3) that the defendant's departure from the standard was a direct cause of [the plaintiff's] injuries." Plutshack v. Univ. of Minn. Hosps., 316 N.W.2d 1, 5 (Minn. 1982). In addition, an affidavit must be served upon a defendant within 180 days after the commencement of the action which identifies each expert the plaintiff expects to call at trial who will testify on the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion. Minn. Stat. § 145.682, subds. 2, 4.

Senty-Haugen submitted an expert affidavit stating that he received "substandard mental health care", but the expert never examined him before preparing her affidavit and failed to diagnose his mental condition. Even if an expert affidavit were not required, however, Senty-Haugen would still be barred as a matter of law from bringing his medical negligence claim because he failed to present any evidence, expert or otherwise, that the allegedly ineffective care caused him an injury. Hudson v. Snyder Body, Inc., 326 N.W.2d 149, 157 (Minn. 1982). Because we conclude that Senty-Haugen has failed to establish facts supporting a prima facie cause of action for negligence, it is unnecessary to determine whether appellees would also be entitled to statutory or common law immunity on this claim. The district court did not err by awarding summary judgment in favor of the appellees.

V.

In sum, Senty-Haugen's claim that he was denied due process by the imposition of isolation fails as a matter of law because the procedures governing his placement in isolation were constitutionally adequate. Since he has not shown that treatment of his health conditions infringed his constitutional rights, that he was retaliated against for exercise of his first amendment rights, or that his right to counsel was infringed,

the district court did not err by granting summary judgment on these claims. Appellees would also be entitled to qualified immunity since their conduct did not infringe on clearly established constitutional rights. <u>See</u> <u>Biby v. Bd. of Regents of Univ. of Nebraska at Lincoln</u>, 419 F.3d 845, 850-51 (8th Cir. 2005). The negligence claim was properly dismissed because Senty-Haugen did not establish the state law requirements for bringing it. We affirm the judgment of the district court, but we dismiss without prejudice his claim that imposition of the costs of treatment violated due process.

_____