**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

———————————————————

MARTIN MARIETTA MATERIALS,
INC.; HUNT MARTIN MATERIALS,
LLC,

     Plaintiffs - Appellants,

v.

KANSAS DEPARTMENT OF
TRANSPORTATION; MIKE KING, in his
individual and official capacity as Kansas
Secretary of Transportation; JERRY
YOUNGER, in his individual and official
capacity as Deputy Secretary of
Transportation and State Transportation
Engineer,

     Defendants - Appellees.

No. 13-3314

———————————————————

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:12-CV-02699-SAC-KGS)**

———————————————————

H. Wayne Phears (Daniel L. Delnero, with him on the briefs), McGuireWoods LLP, Atlanta, Georgia, for Plaintiffs-Appellants.

Lyndon W. Vix (Carmen D. Tucker Bakarich and Gelene D. Savage, Kansas Depatment of Transportation, Topeka, Kansas, and Charles E. Milsap, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, Kansas with him on the brief), Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, Kansas, for Kansas Department of Transportation, Defendant-Appellee.

———————————————————

Before **KELLY**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

## INTRODUCTION

Martin Marietta Materials, Inc. appeals the district court's dismissal of its due-process claims against the Kansas Department of Transportation (KDOT). After KDOT removed two Martin Marietta quarries from its preapproved lists of limestone-aggregate suppliers, Martin Marietta unsuccessfully sought pre- and post-deprivation hearings from KDOT. Among its many claims in its federal lawsuit—most abandoned on appeal—it asserted a property-right claim under the Fourteenth Amendment. Specifically, it claimed a property interest in keeping its two quarries on "the approved list" of aggregate suppliers,[1] and a liberty interest in its reputation as a

---

[1] The dissent says that we have "mischaracterized the nature of Martin Marietta's asserted property interest" by "repeatedly and consistently stat[ing] that Martin Marietta asserts a property interest in actually supplying aggregate from its quarries to KDOT projects." Dissent at 1, 4. Three responses. First, the quotations the dissent references from our opinion address the limitations of Martin Marietta's legal theory—they explain why it isn't entitled to relief. Second, the dissent itself admits that Martin Marietta's Complaint claimed a property and liberty interest to supply limestone from its quarries, but says Martin no longer pursues this claim on appeal. _Id_. at 3 n.2. And, third, here's a sample of Martin Marietta's own characterization of its claim on appeal: "The Right to Supply Aggregate to KDOT-Funded Projects is Governed by Inclusion on the Approved List." Appellant's Br. at 3. In any event, as discussed in the opinion, Martin Marietta's claim also fails because neither its Ottawa nor its Sunflower Quarry passed the 2013 testing standards, so neither qualifies for the 2013 prequalified list. Those failures to qualify defeat any property interest in being on the 2013 prequalified list. We see nothing in the dissent disputing this.

2

supplier of quality materials under the Fourteenth Amendment. The district court disagreed, dismissing these claims on the pleadings.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. We hold that Martin Marietta has not plausibly alleged a protected property interest, and thus that KDOT did not violate Martin Marietta's procedural-due-process rights by failing to provide pre- or post-deprivation hearings. We also hold that Martin Marietta has no cognizable liberty interest, because KDOT did not make defamatory statements about Martin Marietta and because Martin Marietta failed to allege sufficiently significant harm to its business.

## I. BACKGROUND

### A. Factual Background

Under Kansas law, KDOT has general supervisory power over all roads and bridges in the state. Kan. Stat. Ann. § 68-404(a) (2014). In exercising this power, KDOT is obligated to "devise and adopt standard plans and specifications for road . . . construction and maintenance" and to "make tests, do research, to inspect and test all materials . . . used for state highway purposes or highway projects involving federal funds, and to develop methods and procedures for this purpose." *Id.* § 68-404(c), (h). The Kansas legislature has also directed KDOT "to adopt rules and regulations to carry out the provisions of this act." *Id.* § 68-404(k).

In accordance with these duties, KDOT has established, as part of its Standard Specifications, quality requirements for materials used in Kansas road-construction

3

projects. KDOT identifies quarries whose aggregate[2] has passed KDOT's tests set forth in its Standard Specifications and places them on a list of preapproved sources.[3] Upon a quarry's meeting KDOT's testing standards and qualifying for its preapproved list,[4] KDOT preliminarily approves that quarry's aggregate for use by contractors working on road projects funded by KDOT and the Federal Highway Administration (FHWA). At the same time, KDOT disallows the use of aggregate from quarries not on the preapproved list.

As part of its business, Martin Marietta supplies limestone aggregate to contractors working on public and private projects. In fact, it is the second largest producer of aggregate in the country. All told, it operates more than 300 quarries in 28 states and employs more than 5,000 people in its construction-aggregate production. For decades, some of its quarries have been on KDOT's preapproved list to supply aggregate, and it has routinely supplied aggregate to contractors working on KDOT projects.

---

[2] "Aggregate" refers to sand, gravel, slag, crushed stone, and like materials that are mixed with a cementing material to form concrete, cement, mortar, or asphalt. These materials are essential in the construction industry. *Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*, 710 F.2d 752, 757 n.4 (11th Cir. 1983).

[3] For KDOT and federal projects, contractors may purchase only aggregate that has passed KDOT's tests and has been placed on the preapproved list. But that does not preclude a supplier from selling other types of rock from its quarry for other purposes. But aggregate for on-grade concrete projects must pass KDOT's various tests, which, as seen in this case, may change over time.

[4] When we refer to KDOT's list of preapproved sources generically (not from a specific time period), we will call it the "preapproved list."

4

This appeal concerns two of Martin Marietta's quarries, Ottawa and Sunflower. Because "the" preapproved list (as Martin Marietta calls it) is really three separate preapproved lists depending on the months and years in question, we must examine Martin Marietta's two quarries individually during each of three time periods to consider Martin Marietta's general claim.

*1. Pre-October 2010*

For decades, Martin Marietta supplied aggregate from the Ottawa Quarry for use in Kansas-roadway projects. It did the same with aggregate from its Sunflower Quarry. Before October 2010, quarries qualified to be on KDOT's "Approved List" to supply aggregate for on-grade concrete projects by passing the ASTM c666 test of 300-cycles at a 95% freeze-thaw durability factor. Both the Ottawa and Sunflower Quarries had passed the 300-cycle test and qualified for the Approved List. Because both quarries successfully sold aggregate until October 2010, we can eliminate from Martin Marietta's claim any KDOT actions before then.

*2. October 2010–January 2013*

In the years leading up to 2010, KDOT began to notice D-cracking on Kansas roads. D-cracking refers to the deterioration of concrete in a D-shaped pattern. It results from damage to the concrete from the expanding and contracting of water during freeze-thaw cycles.

On or before October 2010, based upon its study of the D-cracking problem on Kansas roads, KDOT adopted a policy (stop-gap measure) of removing from its Approved List any quarry when: (1) KDOT confirmed D-cracking at three separate

5

stretches of road, (2) the same quarry had supplied the aggregate for those roads, and (3) the road-construction projects for those stretches of road had been completed less than 20 years before KDOT confirmed the D-cracking on them.[5] On October 29, 2010, KDOT informed Martin Marietta that it had removed Ottawa Quarry from the Approved List for aggregate because Ottawa's aggregate had failed the stop-gap measure. Martin Marietta requested a hearing to challenge the removal, but KDOT denied the request. In support of its request for a hearing, Martin Marietta argued that it could show that aggregate from the Ottawa Quarry had not in fact caused the D-cracking.

We understand Martin Marietta to claim that it had a property interest in Ottawa Quarry's remaining on the Approved List from October 2010 until January 2013 (Stop-Gap Approved List) despite KDOT's additional requirement imposed by the stop-gap measure. Martin Marietta alleges that because the stop-gap measure was not validly approved by FHWA, and thus not adopted into the Standard Specifications, KDOT could not remove quarries from "the Approved List" based on this test. We do not understand Martin Marietta to make this same claim for Sunflower Quarry, which remained on the Stop-Gap Approved List during this 27-month interval and continued to remain eligible to supply aggregate during that time.

---

[5] After KDOT adopted this stop-gap measure, it removed nine quarries from the list based on their failure. The empirical condition was in place for 27 months until a new—and more stringent—scientific test was approved and adopted after studying the D-cracking problem further. For that reason, we refer to the 27-month period as a "stop-gap."

### 3. *January 2013 and Beyond*

In January 2013, KDOT changed the name of the preapproved list for aggregate to the "Prequalified List" to reflect newly adopted testing standards in the Standard Specifications. As mentioned, the new test imposed a more stringent standard for aggregate used in on-grade concrete projects: a 660-cycle freeze-thaw test with a 95% durability factor. On January 11, 2013, KDOT informed Martin Marietta by letter that Sunflower Quarry's aggregate had failed the 660-cycle test. Martin Marietta admits that Sunflower Quarry's aggregate "allegedly failed" the more-stringent test "by a very narrow margin, while passing other criteria." Appellant's App. at 23. Because it failed, KDOT declined to place it on the Prequalified List. After it received KDOT's letter, Martin Marietta requested pre- and post-deprivation hearings, but KDOT refused to provide either. In support of its request for a hearing, Martin Marietta argued that it could show that aggregate from Sunflower Quarry satisfied the Standard Specifications "in effect" at the time of removal. Appellant's Opening Br. at 49. We assume Martin Marietta was referring to the 660-cycle test that KDOT imposed in January 2013.

We see nothing in the record, in Martin Marietta's Complaint, in its Amended Complaint, or in its briefing to us suggesting that KDOT ever tested Ottawa Quarry's aggregate using the new 660-cycle test, or that Ottawa's aggregate has ever passed this test. At oral argument, when questioned on this point, Martin Marietta said that it did not know whether KDOT had tested Ottawa Quarry's aggregate under the new test.

We understand Martin Marietta to contend, somehow, that its Ottawa Quarry and Sunflower Quarry had a property interest in being on the new Prequalified List despite Ottawa's aggregate not being tested under the 660-cycle test and Sunflower's failing that test. Here, we express some frustration that Martin Marietta has not explained its claim satisfactorily either in its briefs or during pointed questioning at oral argument. As seen later, we painstakingly cover the field of Martin Marietta's possible theories supporting its claim. Martin Marietta's continued references to "the Approved List" are unhelpful when its claim covers an interval in which three different "approved lists" applied.

Regardless, because neither Ottawa Quarry nor Sunflower Quarry qualified for the Prequalified List by passing KDOT's new 660-cycle test, Martin Marietta can no longer supply aggregate from those quarries to KDOT- and FHWA-funded projects for on-grade concrete roadways.[6] According to Martin Marietta, being on the Prequalified List is a "stamp of approval" in the industry, and private contractors also use it to select their suppliers. Appellant's Opening Br. at 11; Appellant's App. at 20–21. Because KDOT determined that neither quarry qualified for its Prequalified List, Martin Marietta claims losses of millions of dollars.

---

[6] Martin Marietta remains free to supply other material from those quarries to KDOT-funded projects for other purposes.

## B. Procedural History

On October 29, 2012, Martin Marietta sued KDOT in federal court. In its Complaint, it alleged that KDOT had erroneously determined that Ottawa Quarry's aggregate caused D-cracking, and it claimed a right to a hearing to challenge KDOT's conclusion. In all, it asserted 11 claims for relief.[7] On January 17, 2013, KDOT filed a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c). KDOT argued that Martin Marietta had not plausibly alleged a property or liberty interest capable of supporting its constitutional claims and that immunity under the Eleventh Amendment barred the tort claims.

---

[7] The eleven claims were as follows: *Claim One*: "Violation of K.A.R. § 36-31-2," alleging KDOT did not comply with the debarment procedures required in this regulation; *Claim Two*: "Violation of Procedural Due Process," because KDOT failed to provide a pre-deprivation hearing; *Claim Three*: "Violation of Procedural Due Process," because KDOT failed to provide a post-deprivation hearing; *Claim Four*: "Intentional Interference with Business Relationships," in the loss of contracts and business caused by KDOT's removal of Ottawa Quarry from the Approved List and refusal to return it; *Claim Five*: "Negligent Interference with Business Relationships," in the loss of contracts and business caused by KDOT's removal of Ottawa Quarry from the Approved List and refusal to return it; *Claim Six*: "Defamation," for falsely representing that Ottawa Quarry did not satisfy the requirements for the Approved List; *Claim Seven*: "Violation of Equal Protection," for KDOT's testing of quarries and decisions to prequalify some quarries but not Martin Marietta's quarries; *Claim Eight*: "Violation of Substantive Due Process," for KDOT's arbitrary and irrational actions that denied Martin Marietta of its property and liberty interests; *Claim Nine*: "Violation of the Takings Clause" by the deprivation of Martin Marietta's property interest to be on the Approved List; *Claim Ten*: "Request for Preliminary and Injunctive Relief" that would put Ottawa Quarry on the Approved List until the hearings were held and would require the prequalification and testing of all Martin Marietta quarries; and *Claim Eleven*: "Request for Declaratory Relief." Appellant's App. at 323–24.

9

On February 13, 2013, while KDOT's motion was pending, Martin Marietta moved to amend its complaint to add similar claims based on KDOT's decision not to place Sunflower Quarry on the Prequalified List after the quarry failed the new freeze-thaw test.[8] In the meantime, the parties continued to file motions and also began discovery. As part of the initial discovery, KDOT designated Rick Kreider as its Fed. R. Civ. P. 30(b)(6) witness. Kreider testified about KDOT's approval criteria used to determine which quarries qualified for KDOT's preapproved lists.[9] Kreider served as KDOT's Chief of the Bureau of Materials and Research, the agency that creates and implements the Standard Specifications and oversees the preapproved lists. On March 15, 2013, Martin Marietta deposed Kreider about KDOT's Standard Specifications, including the considerations used in setting testing criteria for aggregate and D-cracking.

On May 21, 2013, the district court denied as futile Martin Marietta's motion to amend its complaint and granted KDOT's motion for judgment on the pleadings on several claims.[10] Relevant to this appeal, the district court concluded that Martin

---

[8] In its motion, Martin Marietta proposed adding a count for void-for-vagueness as an alternative claim for relief to counts one through three, seven, and eight.

[9] When a government agency is deposed, the agency "must then designate one or more . . . persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify." Fed. R. Civ. P. 30(b)(6).

[10] The district court granted KDOT's judgment on the pleadings for the following claims: *Claim One* (Violation of K.A.R. § 36-31-2), *Claim Two* (Violation of 42 U.S.C. § 1983: Procedural Due Process—Pre-Deprivation Notice and Hearing), *Claim Three* (Violation of 42 U.S.C. § 1983: Procedural Due Process—Post-

Marietta had not alleged a plausible claim supporting its claimed property interest in having its quarries on any of KDOT's preapproved lists. As its basis, the district court concluded that a supplier's being on a preapproved list does not guarantee the supplier any particular outcome (e.g., supplying construction aggregate). Under the Eleventh Amendment, the district court also dismissed KDOT as a party to the lawsuit. In response, Martin Marietta moved for reconsideration, contending that the district court had failed to consider Kreider's testimony and failed to defer to his understanding and interpretation of KDOT's rules. The district court denied the motion for reconsideration, stating that it had considered the proffered testimony and had found it consistent with KDOT's position.

On November 8, 2013, Martin Marietta filed its First Amended Complaint, which listed only the claims from its February 13, 2013 Proposed Amended Complaint that

_____

Deprivation Notice and Hearing), *Claim Five* (Negligent Interference with Business Relationships), *Claim Six* (Defamation), *Claim Eight* (Violation of 42 U.S.C. § 1983: Substantive Due Process), and *Claim Nine* (Ten in the February 13, 2013 Proposed Amended Complaint) (Violation of the Takings Clause).

The district court further concluded that *Claim Ten* and *Claim Eleven* (Eleven and Twelve in the February 13, 2013 Proposed Amended Complaint) did not allege separate claims for relief but instead asked for injunctive and declaratory relief for the remaining claims: *Claim Seven* (Violation of 42 U.S.C. § 1983: Equal Protection) and *Claim Nine* (the February 13, 2013 Proposed Amended Complaint Alternative Count of Void of Vagueness).

Finally, the district court denied KDOT's motion for judgment on the pleadings, but granted Martin Marietta's motion for leave to file its amended complaint, for *Claim Four* (Intentional Interference with Business Relationships), *Claim Seven* (Violation of 42 U.S.C. § 1983: Equal Protection), *Claim Nine* (the February 13, 2013 Proposed Amended Complaint Alternative Claim for Void for Vagueness), and *Claim Ten* and *Claim Eleven* (Eleven and Twelve in the February 13, 2013 Proposed Amended Complaint) seeking injunctive and declaratory relief.

the district court had later allowed in the May 21, 2013 order. Before KDOT could respond to the First Amended Complaint, Martin Marietta moved to dismiss all its claims, both from the February 13, 2013 Proposed Amended Complaint and the First Amended Complaint, presumably so that it could appeal. In its motion, Martin Marietta explained that "[d]ismissal pursuant to this motion shall not affect in any manner the claims that were resolved by the Court in its [May 21, 2013 order] ruling on Defendant's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) . . . ." Appellee's Suppl. App. at 209. It requested that the district court enter an order directing the "final judgment on those claims resolved by the Court in its [May 21, 2013 order] and those claims for which [Martin Marietta] seek[s] dismissal in this motion." *Id.* The defendants consented to the proposed dismissal, the district court dismissed all claims, and the clerk of court entered a final judgment on all of Martin Marietta's claims. Martin Marietta timely appealed.[11]

On appeal, Martin Marietta does not challenge the district court's dismissal of KDOT as a party. Instead, it proceeds forward solely on its claims against Mike King, the Secretary of Transportation, and Jerry Younger, the Deputy Secretary of Transportation and State Transportation Engineer, in their individual and official capacities. Addressing the official-capacity claims against the two men, the district

---

[11] The district court's grant of Martin Marietta's motion to dismiss its claims ripened the case for appeal. *See Niemi v. Lasshofer*, 770 F.3d 1331, 1342 (10th Cir. 2014) ("A dismissal of all claims with prejudice, even if voluntarily sought by the party who initiated the suit, is final for purposes of appellate jurisdiction, making [Fed. R. Civ. P.] 54(b) certification unnecessary.").

12

court concluded that the Eleventh Amendment barred the claims. The district court permitted Martin Marietta to bring any prospective, federal claims against King and Younger, including procedural due process, equal protection, substantive due process, and void for vagueness. Addressing the individual-capacity claims against King and Younger, the court stated that the Eleventh Amendment offered no immunity. King challenged the claims involving the Ottawa Quarry because he did not become Secretary of Transportation until over a year after the Ottawa Quarry was removed from the Approved List. But the court noted that he had "refused to restore the Ottawa quarry to the [Approved List] or to grant them a due process hearing," meaning that Martin Marietta had sufficiently alleged King's personal involvement in the ongoing violation against Ottawa Quarry. Appellant's. App. at 334. Thus, it appears from the district court's order that Martin Marietta was free to bring any of its prospective federal claims against King and Younger in their official capacities and any of its claims—state or federal—against King and Younger in their individual capacities.

In spite of the broad array of permitted claims, Martin Marietta raises on appeal only the procedural-due-process claim. Martin Marietta contends that King and Younger denied it due process under the Fourteenth Amendment by not providing it deprivation hearings before removing Ottawa Quarry from the Approved List (October 2010–January 2013) and before refusing Sunflower Quarry a place on the Prequalified List (post-January 2013).

13

## II.    DISCUSSION

This court reviews "a dismissal granted under Rule 12(c) 'under the standard of review applicable to a Rule 12(b)(6) motion to dismiss.'" *Nelson v. State Farm Mut. Auto. Ins. Co.*, 419 F.3d 1117, 1119 (10th Cir. 2005) (quoting *McHenry v. Utah Valley Hosp.*, 927 F.2d 1125, 1126 (10th Cir. 1991)). Thus, we review de novo a district court's dismissal under Rule 12(c). *Id.* We must "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in that party's favor." *Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1141 (10th Cir. 2012) (quotation marks omitted). In reviewing a motion to dismiss, this court must look for "plausibility in th[e] complaint." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (alteration in original); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (concluding that we do "not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the alleged claim for relief).

The Fourteenth Amendment prohibits any state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To be entitled to procedural due process, Martin Marietta must prove it has either a protected property or liberty interest. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972) ("The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."). A procedural-due-process claim requires (1) a

14

constitutionally cognizable liberty or property interest, (2) a deprivation of this interest, and (3) a lack of constitutionally adequate notice and a hearing. *Id.* at 569–70.

To determine whether a plaintiff has been deprived of procedural due process, courts ask two questions: (1) Did the plaintiff possess a protected property or liberty interest to which due process protections apply? And if so, (2) was the plaintiff afforded an appropriate level of process? *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994). Because we agree with the district court that Martin Marietta alleged no plausible protected property or liberty interest, we need address only the first question.

**A. Property Interest**

As support for its claim to a protected property interest, Martin Marietta contends that it has a right to be on "the Approved List." Appellant's Opening Br. at 21. But this hardly helps us understand its claim, because our case involves three—not one— preapproved lists: the Approved List (pre-October 2010), the Stop-Gap Approved List (October 2010 – January 2013), and the Prequalified List (post-January 2013). Nowhere has Martin Marietta explained what supports its view that it has a property interest in either of the two most recent preapproved lists (the first presumably is not in play since Martin Marietta sold aggregate from both quarries until October

15

2010).[12] Based on its vague and ambiguous use of the term "the Approved List," we understand Martin Marietta to be claiming that it had a property interest to supply aggregate from Ottawa Quarry to KDOT and FHWA projects from October 2010, when KDOT removed Ottawa Quarry from the Approved List, to January 2013, when the new testing was implemented, and perhaps even after that. And for Sunflower Quarry, we believe Martin Marietta is asserting that it had a property interest to supply aggregate to KDOT and FHWA projects from January 2013 until the present and beyond. Whatever Martin Marietta's theory, which it has failed to explain, it must account for its admission that Sunflower Quarry "allegedly failed" the new 660-cycle test required in January 2013.

Martin Marietta argues that the district court erred in concluding that it had not plausibly alleged a property interest as needed to state a due-process claim. "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Roth*, 408 U.S. at 576. The plaintiff "must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577. Such an

---

[12] The dissent also ignores the reality that this case involves the three mentioned lists, simply joining Martin Marietta in ambiguously lumping them together as "the Approved List." Dissent at 1, 3-5, 8, 10. In addition, the dissent leaves unexplained how Martin Marietta could establish a property right in having its Ottawa or Sunflower Quarries on each of the three distinct lists. For instance, it fails even to acknowledge that material from the Sunflower Quarry failed the 2013 testing standards and that material from the Ottawa Quarry wasn't even tested. We don't "chide" Martin Marietta for this failure. *Id*. at 5 n.6. Instead, in resolving the case, we simply point out the deficiencies in its pleading and argument.

interest does not arise from the Due Process Clause itself, but is "defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Driggins v. City of Okla. City*, 954 F.2d 1511, 1513 (10th Cir. 1992) (quoting *Roth*, 408 U.S. at 577). Martin Marietta must demonstrate an "entitlement to a substantive right or benefit" supported by "rules or mutually explicit understandings . . . that support [its] claim of entitlement to the benefit and that [it] may invoke at a hearing." *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1085 (10th Cir. 2006).

On two grounds, Martin Marietta alleges that it has a property interest: (1) KDOT's discretion in determining which quarries are on the preapproved lists is limited by the Standard Specifications; and (2) KDOT has created a mutually explicit understanding with suppliers that it will approve aggregate meeting the Standard Specifications. Because Martin Marietta has failed to adequately explain its legal theory justifying the first ground, we take special care to consider its argument in three separate pieces: (1) pre-October 2010, (2) October 2010 through January 2013, and (3) January 2013 and beyond.

### 1. *Pre-October 2010*

As mentioned, before October 2010, KDOT tested aggregate based on the 300-cycle test at a 95% durability factor. Both Ottawa and Sunflower Quarries were on the Approved List and supplied aggregate to KDOT projects during this time.

17

Therefore, we do not understand Martin Marietta to assert any claim based on KDOT's actions before October 2010.

### 2. *October 2010–January 2013*

In October 2010, after observing D-cracking on Kansas roads, KDOT refined its Approved List by requiring that quarries not have failed the stop-gap measure. Martin Marietta asserts that KDOT never submitted the stop-gap measure to the FHWA and that KDOT never adopted the test into the Standard Specifications. At this juncture, Sunflower Quarry remained on the Approved List and so we focus on Ottawa Quarry. Ottawa Quarry failed the new stop-gap measure because KDOT employees observed D-cracking in at least three such roadways built with Ottawa Quarry's aggregate and the cracking occurring within 20 years of constructing the roadways. As such, KDOT removed it from the Approved List, together with eight other quarries.

We understand Martin Marietta to contend that, because the FHWA did not approve the stop-gap measure, and thus it was not included in the Standard Specifications, KDOT did not have the authority to remove quarries from the Approved List based on a quarry's failing this test. We do not have to address this argument's relevance here because Martin Marietta did not raise it before the district court until its motion for reconsideration. We have held that a party's attempt to raise a new argument in a motion for reconsideration is "not sufficient to preserve it for appeal." *Braswell v. Cincinnati Inc.*, 731 F.3d 1081, 1093 (10th Cir. 2013). "This rule, however, 'is not inflexible and the matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the

18

courts of appeals, to be exercised on the facts of individual cases.'" *Id.* at 1092–93 (quoting *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1170 n.7 (10th Cir. 2007)).

Martin Marietta touched on this argument only briefly in its motion for reconsideration. Its argument was so cursory that the district court did not even address it in its order denying the motion for reconsideration. Thus, we have no obligation to address it at all. *See Braswell*, 731 F.3d at 1093 (citing *Anderson v. Unisys Corp.*, 52 F.3d 764, 765 (8th Cir. 1995) (declining to rule on an argument raised for the first time in a motion for reconsideration when the district court did not address the argument)).

But even if Martin Marietta had raised this argument below, it would fail.[13] The remaining defendants, King and Younger, contend that nothing in Kansas law constrains KDOT's authority to adopt and change the Standard Specifications to fulfill its duties. *See* Kan. Stat. Ann. § 68-404. They explain that just because the "amendments must be approved by the [FHWA] *for KDOT to receive federal funding for certain projects* does not create a property [interest] for a supplier such as Martin Marietta . . . ." Appellee's Br. at 47 (emphasis in original). We understand the defendants to argue that KDOT might jeopardize federal funding by unilateral

---

[13] We reiterate that Martin Marietta did not properly preserve this argument for appeal.

19

amendments to the Standard Specifications but that its doing so is of no concern to Martin Marietta.

We agree with King and Younger. First, KDOT's decision to strengthen its testing protocols to avoid D-cracking was hardly one likely to raise FHWA's ire—by requiring better aggregate, KDOT would build more durable roads. Second, and relatedly, KDOT faced a D-cracking problem threatening public safety and taxpayer expenditures. If FHWA took offense to KDOT's acting quickly on these concerns, it had authority to take any necessary actions. But Martin Marietta cannot assume FHWA's authority. Third, KDOT considered and deliberated its potential actions before adopting the stop-gap measure from October 2010 to January 2013. Based on findings from its studious research on D-cracking,[14] KDOT removed nine quarries from its Approved List (including Ottawa Quarry) based on demonstrated D-cracking associated with use of their aggregate. KDOT continued to remove quarries until January 2013 when it implemented its new 660-cycle test designed to ensure the

---

[14] The study found that 523 lane-miles of on-grade pavement showed D-cracking less than 20 years after construction. Heather A. McLeod, *D-Cracking Field Performance of Portland Cement Concrete Pavements Containing Limestone in Kansas: Phase 1 Report*, Kan. Dep't of Transp. 27 (May 2012), ntl.bts.gov/lib/45000/45200/45246/KS123_Final.pdf. The cost of reconstructing two-lane concrete pavement per lane-mile is between $800,000 and $1.15 million, while the shorter-term remedy of resurfacing costs between $300,000 and $500,000 per lane-mile. *Id.* at 2. In addition to monetary considerations, KDOT also must account for its responsibility for public safety. Where a supplier is providing inferior aggregate, which creates dangerous conditions for drivers by increasing the amount of road damage, KDOT must have the flexibility to address the problem quickly. One mechanism for ensuring safer roads, thereby protecting the public, is for KDOT to heighten the quality-criteria standards for aggregate.

durability and safety of Kansas roadways.[15] Fourth, KDOT's actions may comport with the Standard Specifications. Section 102.18(a) provides that "[e]ven though a Contractor is qualified . . . the Prequalification Committee may determine a Contractor is otherwise non-responsible as lacking the skills, abilities, or integrity to perform the work." *See Bidding Requirements and Conditions*, Kan. Dep't of Transp., www.ksdot.org/Assets/wwwksdotorg/bureaus/burConsMain/specprov/2007/102.pdf. If KDOT is able to deny a benefit to a prequalified contractor based upon concerns about the contractor's skills or abilities to perform the work, we cannot believe that KDOT is unable to take similar measures to ensure that materials from prequalified suppliers are of the character necessary to produce a quality road. We find support for our view in *Trout v. Koss Construction Co.*, 727 P.2d 450 (Kan. 1986), where the Kansas Supreme Court stated that "it is clear from the Standard Specifications that . . . KDOT retains the ultimate authority to dictate safety measures to the contractor and to require compliance with such measures." *Trout*, 727 P.2d at 456. We think this applies with equal force to the construction suppliers.

   3. *January 2013 and Beyond*

---

[15] Kreider testified that KDOT's change to the 660-cycle test occurred because of damage KDOT observed on Kansas roads. KDOT began researching the problem (the D-cracking project) to understand its cause. During that process, it became apparent to KDOT that it needed to modify its Standard Specifications. Ultimately, this led to a study that proposed and recommended options. From these, KDOT chose and imposed the 660-cycle test.

For the reasons given, we conclude that in January 2013, KDOT acted within its authority under the Standard Specifications in implementing the 660-cycle test. *See* Kan. Stat. Ann. § 68-404(h) (KDOT has the power "to make tests, do research, to inspect and test all materials, supplies, equipment, and machinery used for state highway purposes or highway projects involving federal funds, and to develop methods and procedures for this purpose"). Sometime near then, KDOT tested aggregate from the Sunflower Quarry under its new test, and the aggregate failed to meet the new standard. Yet even acknowledging the "allegedly failed" test, Martin Marietta still maintains it somehow has a property interest in the Sunflower Quarry's being on the Prequalified List. Appellant's Opening Br. at 35; Appellant's App. at 23, 441. Seemingly, on appeal, Martin Marietta also contends that it has a property interest in the Ottawa Quarry's being on the Prequalified List. Both in its briefing and at oral argument, it has failed to explain its supporting rationale. Because we are reviewing a dismissal on the pleadings, we broadly review Martin Marietta's claims to see if it has alleged even a single plausible one. *See Alvarado*, 493 F.3d at 1215. In doing so, we recognize that Martin Marietta may not make some of the claims we credit it as making, but given its impreciseness we will err on the side of broadly construing its claims to avoid overlooking any.

Regarding Ottawa Quarry, Martin Marietta never alleges that KDOT tested aggregate from the Ottawa Quarry after implementing the new 660-cycle test. To claim that Ottawa Quarry should be on the Prequalified List, Martin Marietta must at least allege that Ottawa's aggregate had been tested under the new requirements.

22

Because Martin Marietta did not plausibly allege that Ottawa Quarry was tested under the 660-cycle test, it has not plausibly alleged entitlement to a place on the Prequalified List.

In its opening brief, Martin Marietta asserts that "[a]gency discretion and judgment simply do not come into play; material either meets the detailed specifications or it does not." Appellant's Opening Br. at 16. Kreider's deposition testimony supports this fact. *See id.* at 29 ("Mr. Kreider testified that inclusion on the [Preapproved List] is governed by the Standard Specifications, not agency discretion." (citing Appellant's App. at 158–59)). Martin Marietta argues, and we agree, that quarries whose aggregate passes the 660-cycle test are placed on the Prequalified List, and quarries whose aggregate fails the test are not placed on the Prequalified List. But we do not see how this helps Martin Marietta. Aggregate tested from the Sunflower Quarry failed the 660-cycle test. Therefore, according to Martin Marietta's own argument, KDOT had no choice but to refuse Sunflower Quarry a place on the Prequalified List. This would end our analysis, except Martin Marietta may be alleging other theories requiring that Sunflower Quarry be on the Prequalified List. We now turn to those possibilities.

First, we understand that Martin Marietta might be arguing that any quarry owner that independently tests its aggregate under the Standard Specifications' criteria, and says its aggregate passes those tests, has a protected property interest. At oral argument, Martin Marietta's counsel stated, "I think you have a property right if you meet the criteria." Oral Arg. at 09:02–09:15. We also see Martin Marietta alluding to

23

this idea in its brief when it writes that if it had been granted a hearing, it "could have shown that both quarries met the Standard Specifications existing at the time of removal." Appellant's Opening Br. at 11. This argument must fail because it would result in a supplier's being able to claim a constitutionally protected property interest in selling its aggregate to KDOT projects without KDOT's having any ability to oversee the material quality. Under KDOT's legislatively required supervisory role, KDOT must "make tests, do research, to inspect and test all materials" used for road construction involving federal funds. Kan. Stat. Ann. § 68-404(h). Therefore, it must maintain oversight over a quarry's aggregate quality to comply with state law.

Second, we understand that Martin Marietta might be arguing that, even if a quarry's aggregate fails KDOT's test, the owner has a protected property interest if it contends that it would pass if given another chance at testing. In essence, Martin Marietta may be alleging a property interest in the right to re-test. We see an inherent problem in Martin Marietta's asking for a post-deprivation hearing after its aggregate had already failed the 660-cycle test. A deprivation hearing's purpose is to give an individual an opportunity to have a voice in the decision before he is deprived of a protected property interest. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). But once Sunflower Quarry's aggregate failed KDOT's new test, we see nothing KDOT could deprive from Martin Marietta.

Third, we understand that Martin Marietta might be arguing that KDOT's new test is too stringent and that KDOT could adequately protect against D-cracking with lower test standards. We take issue with this argument because it would require that

24

we supplant KDOT in establishing the appropriate tests. It should go without saying that KDOT, not a federal court, should decide what tests and standards to adopt to protect motorists from unsafe roadways. If KDOT wants to adopt a 1000-cycle, 99% durability factor test, we think it would be perfectly within its rights to do so, even if that test would exclude many quarries' aggregate that in fact would not have caused D-cracking.

But even ignoring everything above, Martin Marietta would still not succeed on its appeal, because it is not in privity with KDOT and because its being on any of the preapproved lists would not entitle it to any particular outcome. We explain below.

### 4. Privity

Because suppliers of construction materials are not in privity with KDOT and its contractors, we reject Martin Marietta's contention that it has a property interest in being on any of KDOT's preapproved lists. We look to the Standard Specifications themselves to determine whether they are for the suppliers' benefit, and we conclude that they are not. The Definitions and Terms section of the Standard Specifications make clear that the Standard Specifications make up part of the contract between KDOT and the "Contractor."[16] Appellant's App. at 376. In contrast, the Standard Specifications state that "[i]nspection, testing, and approval of Contractor-furnished

---

[16] The "Contractor" is "[t]he individual partnership, corporation, other legal entity, or any acceptable combination thereof (joint venture) contracting with the Secretary to complete the contract." Appellant's App. at 376. The "Contract" between the Secretary of KDOT and the Contractor setting forth the parties' obligations "includes . . . [the] standard specifications . . . ." *Id.*

25

sources of supply *are for KDOT's benefit . . . .*" *Id.* at 367 (emphasis added). A "Supplier" is defined as "[a]n individual, partnership, corporation, other legal entity, or any combination thereof (joint venture) from which the Contractor obtains commodities needed to fulfill the contract. *Suppliers are not a party to the contract between the Secretary and the Contractor.*" *Id.* at 381 (emphasis added). Thus, we know that Martin Marietta is not a party to the contract (that includes the Standard Specifications) between KDOT and the contractor.

We agree with King and Younger that, because Martin Marietta is not a party to the contract, it cannot claim a property interest arising out of that contract. In *Biby v. Boards of Regents*, 419 F.3d 845 (8th Cir. 2005), the Eighth Circuit concluded that a non-party to the contract who gained from it an incidental benefit had no property interest entitling him to due process. *Biby*, 419 F.3d at 852; *see Machisa v. Columbus City Bd. of Educ.*, 563 F. App'x 458, 463 n.5 (6th Cir. 2014) (unpublished) ("[B]ecause [plaintiff] was not a party to the contract, he had no property interest in the contract and therefore cannot bring a procedural due process claim on this basis at all."); *Rooker v. Ouray Cty.*, 504 F. App'x 734, 738 (10th Cir. 2012) (unpublished) (concluding that a third-party beneficiary to a contract did not have a property interest arising out of the contract). While Martin Marietta may plausibly allege that it has an incidental benefit from the contract between KDOT and the contractor— eligibility to supply aggregate to state projects—it is not a party to the contract and so cannot claim a property interest arising from that contract. In *Empire Transit Mix, Inc. v. Giuliani*, 37 F. Supp. 2d 331 (S.D.N.Y. 1999), the court concluded that a

26

construction supplier did not have a property interest in its supply contracts with contractors on city projects, because under Second Circuit precedent "involvement in publicly-financed projects does not rise to the level of a property interest." *Giuliani*, 37 F. Supp. 2d at 335 (quoting *Eastway Constr. Corp. v. City of N.Y.*, 762 F.2d 243, 250 (2d Cir. 1985), *on remand*, 637 F. Supp. 558 (E.D.N.Y. 1986), *modified*, 821 F.2d 121 (2d Cir. 1987)). Likewise here, Martin Marietta cannot claim a property interest arising from its involvement in publicly financed construction projects.

Because KDOT's Standard Specifications, and therefore the tests at issue, are for KDOT's benefit and not the suppliers', we conclude that Martin Marietta has no basis to claim a property interest arising out of the Standard Specifications. Martin Marietta emphasizes that the Standard Specifications "are not locked in a KDOT desk drawer accessible only by senior policy-making officials . . . . They are public documents KDOT publishes 'so folks can figure out what specific criteria their material must meet.'" Appellant's Opening Br. at 50 (quoting Appellant's App. at 154). But KDOT's making the Standard Specifications available to the public has no bearing on their legal effect. In its very first section, the Standard Specifications state that "Suppliers are not a party to the contract," which undermines Martin Marietta's entire argument. Appellant's App. at 365. KDOT's making the Standard Specifications available to suppliers is an act done voluntarily and not by any legal duty, and therefore no legal obligation—such as providing a pre- or post-deprivation hearing—can arise from its having made the Standard Specifications available.

27

In addition, we point out that courts typically hesitate to second guess government procurement decisions in bidding cases. The Supreme Court has stated:

> Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases. . . . Judicial restraint of those who administer the Government's purchasing would constitute a break with settled judicial practice and a departure into fields hitherto wisely and happily apportioned by the genius of our polity to the administration of another branch of Government.

*Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127–28 (1940) (footnote omitted); *see Coyne-Delany Co. v. Capital Dev. Bd.*, 616 F.2d 341, 342 (7th Cir. 1980) (citing *Perkins*, 310 U.S. at 127) ("[G]overnment enjoys a broad freedom to deal with whom it chooses on such terms as it chooses; no one has a 'right' to sell to the government that which the government does not wish to buy."). We see wisdom in the caution against courts intruding into a state agency's decision-making authority, particularly when it involves public-safety issues.

### 5. *Entitlement*

But even if Martin Marietta was a party to the contract and thus could assert a property interest arising from the Standard Specifications, it would still be unable to allege a property interest because being on the preapproved lists would not grant it any entitlement. In determining whether a state has created an entitlement in a benefit, we must remember that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). "A property interest exists if discretion is

28

limited by the procedures in question, that is, whether the procedures, if followed, *require a particular outcome*. However, where the governing body retains discretion and the outcome of the proceeding is not determined by the particular procedure at issue," then no property interest exists. *Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1217 (10th Cir. 2003) (citation omitted) (emphasis added) (citing *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000)); *see Glover v. Mabrey*, 384 F. App'x 763, 777 (10th Cir. 2010) (unpublished) ("There is no protected property or liberty interest when the outcome of the process is within the government official's complete discretion." (citing *Nichols v. Bd. of Cty. Comm'rs of the City of La Plata*, 506 F.3d 962, 970 (10th Cir. 2007))).

Martin Marietta asserts that it has a constitutionally protected property interest in being on the preapproved list because the detailed, technical criteria set forth in KDOT's Standard Specifications exclusively govern prequalified status.

The district court dismissed Martin Marietta's procedural-due-process claim, explaining that

> To assume that the detailed, technical and objective nature of the specifications and testing criteria reflects an effort to limit KDOT's discretion in enforcing and applying these standards ignores the nature and function of KDOT's highly technical work and its compelling public safety responsibility. . . . Owing to its breadth, this statutory mandate plainly and necessarily vests all such matters in the full discretion of KDOT to develop its own criteria, methods and procedures for this public safety purpose. The related regulations and specifications do not otherwise restrict or delimit the manner, the scope or content of that discretion to such an extent as to give rise to an entitlement.

29

Appellant's App. at 343–44. It concluded that Martin Marietta had not plausibly alleged a property interest because KDOT retained discretion to inspect and judge, at the project site, whether the aggregate satisfies the requisite quality criteria, and to reject it if not. Therefore, a quarry's prequalification status does not guarantee that its aggregate will be accepted and used on a project. Accordingly, the district court concluded that a quarry's prequalified status guarantees no particular outcome.

We conclude that the Standard Specifications support the district court's view. For instance, section 1101.5 states that KDOT "reserves the right to re-sample, test and reject any previously accepted aggregate if the Engineer has reason to believe it no longer complies with the Contract Documents."[17] Appellant's App. at 386. Similar

---

[17] Because the Contract Documents are not in the record, Martin Marietta takes issue with the district court's reliance on this provision that discusses the Contract Documents. In response, KDOT notes that the definition of Contract Documents is contained in the Standard Specifications:

> An all-encompassing term for all documents relating to the contract and hereby incorporated by reference into the contract. The Contract Documents include the proposal, exploratory work documents, addenda, amendments, contract form, contract bond, standard specifications, special provisions, project special provisions, general plans, detailed plans, the notice to proceed, material test methods, material test reports, material certifications, Part V of the KDOT Construction Manual, change orders, payment vouchers, guarantees, warranties, and other agreements, if any, that are required to complete the construction of the work timely and in an acceptable manner.

Appellant's App. at 376.

We think that this definition adequately explains what the Contract Documents are. Based on this definition, we believe that Martin Marietta could not, as it states that it could, prove that compliance with the Contract Documents means compliance

provisions are found in section 106(b), which governs the source of supply, and which gives the Engineer or Inspector the authority to "reject materials at the project site even if the Engineer or Inspector previously approved the materials at the source of supply" and the authority to "reject the materials if, at any time, the Engineer determines the materials do not meet the Contract Documents." Appellant's App. at 367. And Part V of the Construction Manual, incorporated under section 101.3, states that:

> The acceptance of . . . Aggregate is contingent upon production being from approved beds and in compliance with "Official Quality" requirements.
>
> . . .
>
> (5) Continuation of Prequalified Status for [Aggregates]
>
> After a quarry has been prequalified to produce . . . [a]ggregate from a specific bed(s) the prequalified status will continue as long as no major changes are made in the production process or occur in the deposit characteristics. Changes in deposit characteristics may be discovered either visually or through test results performed on Production Samples.
>
> . . .
>
> When any party feels that any change in the prequalified status of a quarry is warranted they should notify the DME [District Materials Engineer] responsible for quarry inspection who in turn will advise the Chief of Materials and Research. The Chief of Materials and Research will review all available information on the changed conditions and render a decision on any such changes. Official notification of any change in . . . [a]ggregate [p]roduction status for a quarry will be

_____

merely with the Standard Specifications. Thus, we find that Martin Marietta is not entitled to additional discovery on what it means to be in compliance with the Contract Documents.

31

provided by the DME to the quarry owner/operator and the appropriate contractors.

Appellant's App. at 368, 372.

We agree with Martin Marietta that KDOT's ability to retest the aggregate and reject it at the project site does not mean that a party's qualifying for a preapproved list is governed by anything but the Standard Specifications. But KDOT's ability to reject the aggregate for other reasons—project special provisions, material-test methods, material-test reports, or change orders—demonstrates that a supplier's being on a preapproved list does not entitle it to sell its material or have that material actually accepted at the project site. Martin Marietta even concedes that KDOT can reject a supplier's aggregate at the project site for reasons other than failure to meet the appropriate tests, including defects in specific material or because the material might fail the Standard Specifications for contamination or size. In addition, Martin Marietta points to no law, regulation, or Standard Specification provision that says that having prequalified status guarantees that a contractor will actually purchase and use its product.

This matters because "[b]eing on the prequalified list is not a protected interest[] since it does not assure the particular outcome, that is, KDOT's acceptance of the aggregate." Appellant's App. at 346. The district court concluded that just because "a source or supplier has been approved is not a guarantee that its product will be accepted and used on a project." *Id.* Because of KDOT's ability to reject preapproved material for reasons other than passing or failing the Standard Specifications, the

32

district court reasoned that it was not examining a regulatory structure where the governing body's "discretion is 'constrained by particularized and comprehensive standards, criteria or conditions outlined by statute . . . .'" Appellant's App. at 344 (quoting *Interior Contractors, Inc. v. Bd. of Trs. of Newman Mem'l Cty. Hosp.*, 185 F. Supp. 2d 1216, 1228 (D. Kan. 2002)).

We agree with the district court's ultimate conclusion and find informative this court's discussion of property interests in *Teigen v. Renfrow*, 511 F.3d 1072 (10th Cir. 2007). In *Teigen*, employees of the Colorado Department of Corrections (DOC) sued DOC officials under 42 U.S.C. § 1983, alleging that the officials had engaged in a policy of blacklisting employees in violation of the Due Process Clause. 511 F.3d at 1077. The employees contended that they possessed, and were deprived of, a protected property interest in the right to be *considered* for promotion and transfer according to the standards set forth in the state statutes. *Id.* at 1080. The court wholly rejected this proposition, explaining that the "subtle distinction between the right to be selected for promotion and the right to take part in the promotion process is insufficient to salvage Plaintiffs' due process claims." *Id.* at 1080–81. "This is because '[p]rocess is not an end in itself,' but instead serves only 'to protect a substantive interest to which the individual has a legitimate claim of entitlement.'" *Id.* at 1081 (alteration in original) (quoting *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983)).

Likewise, Martin Marietta's attempt to distinguish between the right to sell its aggregate to KDOT projects and the right to have the *opportunity* to sell its aggregate

33

to KDOT projects by being on a preapproved list cannot save its due process claim. In *Teigen*, the court said that "[e]ven assuming state law grants every state employee the right to be fairly considered for promotion, this right is not itself a substantive right, but rather a vehicle for arriving at the ultimate promotion decision." *Id.* Martin Marietta's situation is one step removed because there is no assumption that every supplier is entitled to have its quarries on a preapproved list. Rather, KDOT explicitly requires, through the Standard Specifications, that each quarry pass the relevant criteria to be on a list. But even if Martin Marietta's aggregate at the two quarries had passed the test and were on a preapproved list (which they were not), it could not plausibly allege a property interest in being on a list because the list is merely a "vehicle" for arriving at the ultimate decision of whether the aggregate will actually be purchased and used. *See id.* This is because KDOT expressly has the discretion to reject aggregate if it has "reason to believe" that the aggregate does not comply with the Contract Documents, which include a variety of requirements beyond the Standard Specifications, and also because prequalified status does not guarantee that Martin Marietta will actually sell its aggregate. *See Horsfield Materials Inc. v. City of Dyersville*, 834 N.W.2d 444, 459 (Iowa 2013) (finding that a supplier of aggregate which, for control purposes, was not included on the City's list of approved suppliers, had no valid due-process claim because it had "no protected liberty or property interest at stake, merely an unfulfilled desire to enter into contracts to supply materials for Dyersville public improvements").

We also find instructive the reasoning in *Ruby-Collins, Inc. v. Cobb County*, 515 S.E.2d 187 (Ga. Ct. App. 1999). In *Ruby-Collins*, a county sued a contractor for breach of contract, and the contractor counter-claimed under § 1983 asserting that the county violated its due-process rights by disallowing the contractor from bidding on future projects pending the outcome of the dispute. 515 S.E.2d at 188–89. The contractor claimed a property interest in being on the list of pre-qualified bidders. *Id.* at 189. Under Georgia law, the county could reject "some bids or any indefinite number of bids" for a project, which the court inferred to mean that no prospective bidder had a legitimate claim of entitlement to bid on future projects. *Id.* at 189–90. Consequently, it held "that [the contractor] ha[d] no protected property interest in remaining on a list of potential bidders pre-qualified to bid on future public works contracts." *Id.* at 190.

Similarly, Martin Marietta claims a property interest in being on the list of preapproved quarries, which in reality would qualify it only to be *considered* for KDOT projects. But KDOT is not bound under the Standard Specifications to ensure that aggregate from each quarry on a preapproved list is purchased and later accepted at the project site. *See Hill v. Grp. Three Hous. Dev. Corp.*, 799 F.2d 385, 391 (8th Cir. 1986) (concluding that eligible applicants for section 8 housing are not "entitled to such benefits" because the private owner retains discretion to select the tenant from a pool of eligible applicants (emphasis omitted)); *see also Eidson v. Pierce*, 745 F.2d 453, 461 (7th Cir. 1984) (same). KDOT retains its discretion to inspect aggregate at any time, even from previously approved sources, and to reject it if the

35

Engineer determines it does not satisfy any requirements in the Contract Documents. *See Nichols v. Bd. of Cty. Comm'rs*, 506 F.3d 962, 970 (10th Cir. 2007) ("[W]here the governing body retains discretion and the outcome of the proceeding is not determined by the particular procedure at issue, no property interest is implicated." (quoting *Crown Point I*, 319 F.3d at 1217)). In addition, KDOT may "reject any previously accepted aggregate if the Engineer *has reason to believe* it no longer complies with the Contract Documents." Appellant's App. at 386 (emphasis added). These provisions demonstrate that even if Martin Marietta's quarries are granted prequalified status, such status does not lead to a particular outcome, because aggregate from Martin Marietta's quarries may never be purchased for KDOT projects, and even if it is, it could be rejected at the site.

The Supreme Court has clearly stated that "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim*, 461 U.S. at 250. Getting its quarries on a preapproved list is the process by which Martin Marietta achieves its ultimate goal— supplying aggregate for KDOT and FHWA projects. Martin Marietta points to no law or regulation suggesting that it has a legitimate claim of entitlement to supply aggregate to KDOT projects. Therefore, Martin Marietta has not plausibly alleged a property interest.

In addition, Martin Marietta relies heavily on a case decided after the district court's order, *Brown v. Eppler*, 725 F.3d 1221 (10th Cir. 2013). In that case, we held that an individual or entity may have a protected property interest if agency rules

36

compel particular relief, even when the agency has discretion to change those rules. *Brown*, 725 F.3d at 1126–27. Martin Marietta reads the district court's order as dismissing its claim in large measure on KDOT's retaining discretion under the Standard Specifications to change the tests and criteria for quarries to qualify for the preapproved list. But we read the district court's order differently—not as saying that any discretion to change testing requirements per se defeats a property interest (as in *Eppler*, where we reversed the district court's so concluding with rules governing who could ride the city buses), but instead as saying that because KDOT has discretion to reject aggregate at the project site, prequalified status does not guarantee a particular outcome, and thus there is no protected property interest.

Martin Marietta also argues that Kreider's deposition testimony establishes that inclusion on a preapproved list is governed by the criteria in the Standard Specifications. Although we do not question this point, we again note that the district court relied on KDOT's discretion to reject aggregate at the project site, not its discretion or lack thereof in the process for determining which quarries' aggregate receives prequalified status. And we rely not only on KDOT's ability to reject aggregate at the project site but also on the basis that KDOT does not guarantee sales to any supplier simply because it is on a preapproved list. We can imagine many scenarios in which contractors choose not to purchase materials from certain suppliers.

37

Next, Martin Marietta argues that the district court erred in comparing "right-to-test procedures"[18] and "right-to-bid cases." Appellant's Opening Br. at 40. We agree with the district court that the right-to-bid cases are instructive because part of their rationale defeating any property interests is the lack of any guaranteed outcome from a right to bid. As with contract bidders, prequalified status does not guarantee aggregate sellers any sales of aggregate or acceptance at the project site. *See S. Disposal, Inc. v. Tex. Waste Mgmt.*, 161 F.3d 1259, 1265 (10th Cir. 1998) ("'[A] disappointed bidder has no constitutionally protected property interest' until it is actually awarded the contract." (quoting *Curtis Ambulance of Fla., Inc. v. Bd. of Cty. Comm'rs*, 811 F.2d 1371, 1376–77 (10th Cir. 1987))); *see also Interior Contractors*, 185 F. Supp. 2d at 1225. By the same token, a potential supplier has no entitlement to sell its material. *See Coyne-Delany*, 616 F.2d at 343 ("[A] potential supplier to the state has no property interest in having its product purchased or specified."). Therefore, regardless of the other differences between these types of cases, we agree with the district court's general premise. Martin Marietta's ability to distinguish the cases in other ways does not help it to undermine our ultimate conclusion.

In supporting its argument, Martin Marietta also emphasizes the content of King and Younger's fifth footnote, which reads as follows:

> It is accurate that KDOT adopted the 660 cycle test and received approval for doing so from [FHWA]. As a result, all quarries were

---

[18] We note that Martin Marietta itself described its alleged property interest as a right-to-procedure interest. The Supreme Court has concluded that a party cannot claim a property interest in a procedure. *Olim*, 461 U.S. at 250.

38

essentially taken back to square one and required to meet that standard in order to be on the [Prequalified List]. From and after January 1, 2013, the presence or absence of Martin Marietta's aggregate on the [Prequalified List] has been based simply upon whether the product can meet the new freeze/thaw criteria, rather than the field testing that caused the initial removal of the Ottawa Quarry.

Appellee's Br. at 10 n.5 (citation omitted). Martin Marietta contends that King and Younger concede three points here. "First, it confirms that testing under the old criteria led to KDOT's removal of the Ottawa Quarry." Appellant's Reply Br. at 23. We have no reason to question this statement. "Second, it confirms that inclusion on the [Prequalified List] 'from and after January 1, 2013' is governed by the new criteria." *Id.* Again, we see no reason to contest this assertion. But Martin Marietta has not plausibly alleged that aggregate from Sunflower Quarry passed the new test or that aggregate from Ottawa Quarry was ever even tested. And even if it could, we still would reject its claim on our earlier stated bases. First, Martin Marietta cannot claim a property interest deriving from a contract to which it is not a party. And second, it cannot allege a property interest in being on a preapproved list because the list does not guarantee any particular outcome.

Finally, Martin Marietta argues that the district court failed to apply the plausibility standard correctly in ruling on the motion for judgment on the pleadings. It contends that the court weighed the evidence and drew inferences against the plaintiff in violation of that standard. We disagree with how Martin Marietta characterizes the district court's application of the standard. The court relied on the provisions of the Standard Specifications, which give KDOT discretion to reject any

39

material, even from a prequalified source, to conclude that prequalified status does not guarantee a particular outcome. The court did not draw inferences against Martin Marietta in coming to that conclusion. Therefore, we find no error in the court's application of the plausibility standard.

To conclude, we note that in our view Martin Marietta is essentially asking us to move outside of the judicial realm and become a super-KDOT. We decline to do so. We lack any scientific expertise to determine what aggregate builds safe roads, and we lack KDOT's statutory responsibility for motorist or taxpayer safety. KDOT is in the best position to determine the level of error it will tolerate in D-cracking testing, and we refuse to question its decision.

### 6. *Mutually Explicit Understanding*

Martin Marietta also urges us to find that it has established a property interest based on a mutually explicit understanding fostered by KDOT—that material complying with the Standard Specifications will remain on the preapproved list. Although a claim of entitlement may be grounded on specific statutory or contractual provisions, it need not be. "A person's interest in a benefit is a 'property' interest for due process purposes if there are . . . rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Casias v. City of Raton*, 738 F.2d 392, 394 (10th Cir. 1984) (quoting *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)); *see Perry*, 408 U.S. at 602–03 (holding for the first time that a protected property interest derived from a mutually explicit understanding rather than laws or regulations). In our view, KDOT has expressly

stated the requirements to win placement on its approved lists and, as explained, Martin Marietta cannot meet them.

### B. Liberty Interest

Martin Marietta also argues that the district court erred in dismissing its due-process claim in which it asserts that it has a liberty interest in its reputation. It claims that the Constitution protects this right by guaranteeing Martin Marietta a procedure in which it can clear its name. The Fourteenth Amendment protects citizens from being deprived of "liberty" as well as "property" without "due process." *Gwinn v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004). Martin Marietta argues that it has a protected interest in its reputation, "including a right not to be defamed by government officials in a manner that harms its ability to earn a living or causes 'damage [to] [its] standing and associations in [its] community.'" Appellant's Opening Br. at 51 (second and third alterations in original) (quoting *Roth*, 408 U.S. at 572–73).

"'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' a protectable liberty interest may be implicated that requires procedural due process in the form of a hearing to clear his name." *Gwinn*, 354 F.3d at 1216 (quoting *Jensen v. Redev. Agency of Sandy City*, 998 F.2d 1550, 1558 (10th Cir. 1993)). Damage to reputation alone, however, is not sufficient. *Id.*; *see Paul v. Davis*, 424 U.S. 693, 711–12 (1976) (holding that damage to reputation alone was not sufficient to establish a protected liberty interest).

41

For a plaintiff to prevail on a claim that the government has violated the Due Process Clause by damaging its reputation, that plaintiff must satisfy the "stigma-plus" standard. That standard requires the plaintiff to demonstrate both "(1) governmental defamation and (2) an alteration in legal status." *Nixon v. City and Cty. of Denver*, 784 F.3d 1364, 1368 (10th Cir. 2015) (quoting *Guttman v. Khalsa*, 669 F.3d 1101, 1125 (10th Cir. 2012)).

Martin Marietta claims that KDOT defamed it (1) when KDOT employees announced to the concrete and pavement industry that aggregate from Martin Marietta's two quarries could not be trusted to make concrete meeting the Standard Specifications, and (2) when KDOT employees attended meetings with some of Martin Marietta's customers and told them that Martin Marietta's material was poor quality. Martin Marietta claims it will show, if permitted, that KDOT "published a document with Martin Marietta quarries listed as providing either 'poor' or 'unacceptable' performance." Appellant's Opening Br. at 52. Martin Marietta then alleges that purely private contractors refused to accept limestone from Martin Marietta's quarries as a result of those statements.

Assuming all of these allegations are true, we fail to see how they amount to defamation. In order to constitute a defamatory statement, the speaker must make a *false* statement. *See Bundren v. Parriott*, 245 F. App'x 822, 826 (10th Cir. 2007) (unpublished) (listing the elements of defamation under Kansas law to include "false . . . words" (quoting *Hall v. Kan. Farm Bureau*, 50 P.3d 495, 504 (Kan. 2002))). Here, KDOT performed tests on Martin Marietta's two quarries, and it determined

42

that the quarries' aggregate failed those tests. KDOT then disseminated this information to the public.

KDOT did not make any false statements. In fact, Martin Marietta concedes that KDOT did not place Sunflower Quarry on the Prequalified List, because it determined that its aggregate had failed the new, more stringent freeze-thaw test. Because KDOT did not make a false statement regarding Sunflower Quarry, it did not defame Martin Marietta. And for Ottawa Quarry, Martin Marietta acknowledges that another entity operated Ottawa Quarry and provided the aggregate for pavement where a KDOT employee later observed D-cracking. We thus agree with the district court's finding that KDOT's removal of Ottawa Quarry does not implicate Martin Marietta's business practices because it did not even own the quarry when the material in question for D-cracking was provided. Upon review, we find no evidence that KDOT made a defamatory statement against Martin Marietta.[19]

But even if Martin Marietta could prove that the government had made defamatory statements regarding its materials, it could not satisfy the "plus" of the stigma-plus standard. First, it cannot argue that the loss of its property interest meets the second prong of the stigma-plus standard, *see WMX Techs., Inc. v. Miller*, 197 F.3d 367, 376 (9th Cir. 1999) (rejecting a stigma-plus claim because the alleged

---

[19] If, however, KDOT had told members of the industry that they should not do business with Martin Marietta because it would cheat them, then we would consider a defamation claim. But merely sharing information that KDOT believes truthful about the quality of aggregate from the Ottawa and Sunflower Quarries does not constitute defamation.

damage to reputation did not amount to the deprivation of a protected property interest), because we hold above that Martin Marietta did not plausibly allege a property interest.

Second, Martin Marietta contends that, even if we do not find a property interest, it can satisfy the "plus" prong because it has alleged significant harm to its business resulting from KDOT's allegedly false statements. If true, this could satisfy the "plus" prong of the test. But we see no basis for this contention. Martin Marietta alleges that KDOT's actions have caused it "financial and economic repercussions beyond [its] ability to supply material for KDOT projects," Appellant's App. at 21, and have "impact[ed] [its] ability to earn a living by selling construction aggregate," *id.* at 27.

Assuming these statements to be true, we believe that they fail to demonstrate the requisite harm to Martin Marietta's business as needed to find a violation of its liberty interest. Martin Marietta must show more harm to its business than the mere fact that it "was no longer able to supply material for [KDOT-funded] jobs." Appellant's Opening Br. at 54; *cf. Jensen*, 998 F.2d at 1559 ("Damage to prospective employment opportunities is too intangible to constitute deprivation of a liberty interest."); *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1269 (10th Cir. 1989) (stating that mere injury to business reputation is insufficient); *Perry v. Fed. Bureau of Investigation*, 781 F.2d 1294, 1302 (7th Cir. 1986) ("[A] liberty interest is not implicated merely by a reduction in an individual's attractiveness to potential employers."); *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 982 (10th Cir. 1991)

44

("Only where the stigmatization results in the inability to obtain other employment does [a liberty-interest] claim rise to a constitutional level."), *overruled on other grounds by Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220 (10th Cir. 2000).

Numerous courts have declined to find a liberty interest when the plaintiff is denied government business but can still engage in private business. *See, e.g.*, *Morley's AutoBody, Inc. v. Hunter*, 70 F.3d 1209, 1217 n.5 (11th Cir. 1995). Not only can Martin Marietta continue to sell aggregate from its Ottawa and Sunflower Quarries to contractors engaged in private projects, it can also supply other types of rock from the quarries to KDOT-funded projects. We agree with the district court that these factual allegations "do not plausibly support . . . a significant impairment to [Martin Marietta's] operating business due to the quarries' removal from [either list]." Appellant's App. at 355–56.

Martin Marietta has failed to allege that the defendants have significantly impaired its activities as the "second largest producer of construction aggregate used in the United States," Appellee's Suppl. App. at 1, by not approving Martin Marietta's aggregate from Sunflower and Ottawa. As such, we hold that Martin Marietta has not plausibly alleged a liberty interest.

### III.   CONCLUSION

In sum, we hold that Martin Marietta has failed to demonstrate either a constitutionally protected property or liberty interest. Therefore, we affirm the district court's decision denying relief.

45

No. 13-3314, *Martin Marietta Materials, Inc. v. Kansas Department of Transportation*

**MORITZ**, J., concurring in part and dissenting in part.

Throughout its opinion, the majority repeatedly and consistently states that Martin Marietta asserts a property interest in actually supplying aggregate from its quarries to KDOT projects. Yet Martin Marietta challenges only the dismissal of its claim that it has a property interest in inclusion or retention on the Approved List—not in actually supplying aggregate.

Applying a properly cabined due process analysis and considering only whether Martin Marietta has a property interest in inclusion or retention on the Approved List, I would hold that Martin Marietta has plausibly stated a legitimate claim to entitlement. Therefore, Martin Marietta's removal from that list without notice or hearing violated its right to due process under the Fourteenth Amendment. Thus, I dissent from the majority's decision affirming the district court's dismissal of Martin Marietta's procedural due process claim with respect to its asserted property interest.

However, because Martin Marietta hasn't challenged on appeal the district court's conclusion that it wasn't defamed, I concur in the majority's decision to affirm the dismissal of its liberty interest claim.

**I.** **Martin Marietta asserts a legitimate claim of entitlement to inclusion and retention on the Approved List.**

To possess a protected property interest, Martin Marietta must show that state statutes, established rules, or mutually explicit understandings give it a "legitimate claim of entitlement" to that interest. An "'abstract need or desire for it' or a 'unilateral

expectation' is insufficient." *Curtis Ambulance of Fla., Inc. v. Bd. of Cty. Comm'rs*, 811 F.2d 1371, 1375 (10th Cir. 1987) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

"A property interest exists if . . . the procedures in question, . . . if followed, require a particular outcome." *Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1217 (10th Cir. 2003). State laws, rules, and regulations don't create property interests if "the governing body retains discretion" to confer or deny a benefit. *Id.* In determining "whether a plaintiff presents a legitimate claim of entitlement," the court "focus[es] on the degree of discretion given the decisionmaker and not on the probability of the decision's favorable outcome," *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence*, 927 F.2d 1111, 1116 (10th Cir. 1991), or on whether the laws, rules, regulations, and procedures in question can be changed, *see Brown v. Eppler*, 725 F.3d 1221, 1226-27 (10th Cir. 2013).

The majority's analysis goes awry early on when it misstates or miscomprehends the interest to which Martin Marietta claims it has a "legitimate claim of entitlement." Specifically, the majority consistently and repeatedly mischaracterizes Martin Marietta's asserted property interest as an interest in *actually supplying* aggregate from its quarries to KDOT projects.[1]

_____

[1] *See, e.g.*, Maj. Op. 15 ("[W]e understand Martin Marietta to be claiming that it had a property interest *to supply aggregate* from Ottawa Quarry to KDOT and FHWA projects." (emphasis added)); *id.* at 15-16 (("[F]or Sunflower Quarry, we believe Martin Marietta is asserting that it had a property interest *to supply aggregate* to KDOT and FHWA projects." (emphasis added)); *id.* at 31 ("Martin Marietta points to no law, regulation, or Standard Specification provision that says that having prequalified status

2

Admittedly, Martin Marietta's pleadings contain some conflicting language regarding the scope of the interest it asserts.[2] And the district court may have conflated those two possible interests in dismissing this case.[3] But on appeal, Martin Marietta clearly challenges only the district court's conclusion that it had no property interest in remaining on the Approved List, and it concedes its property interest isn't contingent on actually supplying material to KDOT projects. *See* Aplt. Reply Br. 25 ("Being on the Approved List is . . . a *right to sell*," which doesn't "guarantee sales." (emphasis added)); *cf. Ripley v. Wyo. Med. Ctr., Inc.*, 559 F.3d 1119, 1124-25 (10th Cir. 2009) (discussing alternative property interests—one in receiving hospital privileges and another in exercising those privileges).[4] Moreover, KDOT recognizes that Martin Marietta argues it

_____

guarantees that a contractor *will actually purchase and use its product*." (emphasis added)); *id.* at 35-36 ("Martin Marietta points to no law or regulation suggesting that it has a legitimate claim of entitlement *to supply aggregate* to KDOT projects." (emphasis added)).

[2] *See, e.g.*, Compl., Doc. 1, ¶ 45, at 12 ("Martin Marietta has a liberty and property interest in being on the A-Listing *and* in supplying limestone from its Ottawa Quarry to KDOT projects . . . ." (emphasis added)); Proposed First Am. Compl., Doc. 31-1, ¶ 52, at 13 ("Martin Marietta has a liberty and property interest in being on the A-Listing/PQL *and* in supplying limestone from its Ottawa and Sunflower Quarries to KDOT projects . . . . (emphasis added)).

[3] See Mem. & Order, Doc. 59, at 29 ("[P]laintiffs are unable to allege a plausible claim of a protected property interest in remaining on the A-Listing/PQL *or* in supplying aggregate for concrete in KDOT's on-grade pavement projects." (emphasis added)).

[4] Further, in response to questioning at oral argument, Martin Marietta explicitly confirmed that its due process claim is based solely on remaining on KDOT's Approved List of aggregate suppliers. *See* Oral Arg. Trans. at 11:04-11:12 (responding to the question, "Are you saying there [are] two different property interests, there's one combined property interest, what is your position?," with, "Our property interest is being on the Approved List.").

3

has a property interest in having "aggregate from its quarries on KDOT's Approved List for use in on-grade pavement." Aplee. Br. 16-17.

Martin Marietta clearly asserts a property interest in its inclusion and retention on the Approved List, and I would consider only that asserted interest in determining whether Martin Marietta has plausibly alleged a violation of procedural due process.

## II.    KDOT lacks discretion to include or remove a qualified quarry from its Approved List if that quarry meets the Standard Specifications.

Having mischaracterized the nature of the asserted property interest, the majority compounds its error by applying the degree-of-discretion test to KDOT's discretion to oversee the quality of the aggregate actually used by suppliers.[5] But again, Martin Marietta doesn't claim an interest in ultimately supplying aggregate, or in contracting with any particular contractor. Nor does Martin Marietta contend that KDOT lacks discretion to oversee the quality of aggregate actually used by contractors. I would restrict application of the degree-of-discretion test to the property interest alleged, and

---

[5] *See, e.g.*, Maj. Op. 23 ("[Martin Marietta's] argument must fail because it would result in a supplier being able to claim a constitutionally protected property interest *in selling its aggregate* to KDOT projects without KDOT having any ability to oversee the material quality." (emphasis added)); *id.* at 31 ("But KDOT's ability to reject the aggregate for other reasons—project special provisions, material-test methods, material-test reports, or change orders—demonstrates that a supplier's being on a preapproved list *does not entitle it to sell its material or have that material actually accepted* at the project site." (emphasis added)); *id.* at 33 ("[P]requalified status does not guarantee that Martin Marietta *will actually sell its aggregate*." (emphasis added)); *id.* at 36-37 ("And we rely not only on KDOT's ability to reject aggregate at the project site but also on the basis that KDOT *does not guarantee sales to any supplier* simply because it is on a preapproved list." (emphasis added)).

4

consider whether KDOT has discretion to include or remove suppliers from its Approved List.[6]

## A.    KDOT's procedure for including a quarry on the Approved List

Kansas' Secretary of Transportation has broad supervisory authority over the "construction and maintenance of all roads . . . throughout the state," with certain exceptions not relevant here. Kan. Stat. Ann. § 68-404(a). This includes authority "to make tests, do research, to inspect and test all materials, supplies, equipment, and machinery used for state highway purposes, and to develop methods and procedures for this purpose." *Id.* § 68-404(h). The Secretary may exercise this authority by "adopt[ing] rules and regulations," *id.* § 68-404(k), and performing "such other acts and duties," *id.* § 68-404(j), necessary to carry out the State's transportation-related laws.

The Secretary has exercised this authority by adopting the Standard Specifications for State Road and Bridge Construction (2007), as amended by the Special Provisions to the Standard Specifications. Division 1100 of the Standard Specifications "covers the

---

[6] The majority chides Martin Marietta for failing to distinguish between the Ottawa quarry's inclusion on the Approved List prior to 2013 and the Sunflower quarry's inclusion on what the majority refers to as a "new" list after 2013. I find the majority's insistence on referring to distinct lists confusing at best, since none of the parties have asserted such a distinction. In any event, the majority's distinction appears to be based on KDOT's ability to change its specifications and create a new list with new specifications, which the majority suggests KDOT did in 2013. But as discussed *infra*, Martin Marietta doesn't dispute KDOT's ability to change its specifications or even to create a new list with new specifications. *See* Aplt. Br. 23-24. Instead, it simply argues that KDOT not only lacks discretion to *remove* suppliers from the existing Approved List, but also lacks discretion to *exclude* suppliers from the Approved List in the first instance if the supplier meets the specifications. *See* Aplt. Br. 5-10. Thus, even assuming KDOT created an entirely new list in 2013, if KDOT lacked discretion to exclude a qualified supplier from that list, then the supplier has a property interest in inclusion on that list.

5

basis of approval, certification and acceptance of aggregates," Std. Specs. § 1101.1, and incorporates the sampling and testing requirements contained in Part V of KDOT's Construction Manual,[7] *id.* § 1101.2(b)(2). Part V, in turn, provides a specific procedure and substantive requirements for sources to prequalify. These procedures and requirements are significant because KDOT will reject any aggregates "produced from deposits, ledges, or beds that have not been previously approved for quality." *Id.* § 1101.2(b)(4).

Inclusion on the Approved List, however, doesn't guarantee a source will be used to supply a KDOT project because contractors choose which source or sources to use. *See id.* § 101, at 9 (defining "suppliers" as entities "from which the Contractor obtains commodities needed to fulfill the contract").

Part V of KDOT's Construction Manual provides the process for prequalifying to supply aggregate. In general,

> [a]dditional testing is performed on concrete produced with Class I and Class II Aggregates to determine if acceptable levels of concrete freeze/thaw resistance are provided. The freeze/thaw testing is intended to reduce the risk of the occurrence of premature "D-Cracking." . . . Prequalification to produce Class I and Class II Aggregate is granted to a quarry on a bed by bed basis for each distinct bed in the quarry face. "Official Quality" sampling and testing is also required. The acceptance of Class I and Class II Aggregate is contingent upon production being from approved beds and in compliance with "Official Quality" requirements.

Part V § 5.02(c)(1).

---

[7] Citations to Part V are to the 2007 version of the Manual, which is located at Doc. No. 59-4 of the district court docket.

Specifically, for inclusion on the Approved List, a quarry operator contacts the District Materials Engineer (DME), who is responsible for initiating KDOT's prequalification process. *Id.* § 5.02(c)(2)a. The Chief Geologist then arranges for a quarry inventory and sample collection. *Id.* § 5.02(c)(2)b. "The quarry inventory and sampling procedures *will be conducted in accordance with written guidelines* maintained by the Chief Geologist." *Id.* (emphasis added). Then,

> [t]he Engineer of Tests *will* process and test the . . . samples to determine if each bed is in compliance with the *specified requirements* for Class I and Class II Aggregate. . . . The Engineer of Tests *will* prepare and distribute a listing showing the approved Class I and Class II beds for each quarry. . . . *Inclusion on the approved listing requires 2 consecutive passing Production Samples representing current production from beds meeting the Class I or Class II requirement.* . . . Exception to this process will require approval of the Chief of Materials and Research.

*Id.* § 5.02(c)(2)c (emphasis added).

In light of these provisions, it's clear that inclusion of a quarry bed on the Approved List isn't left to KDOT's discretion.[8] After all, the Standard Specifications speak in terms of procedures that "*will* be conducted in accordance with *written guidelines,*" *id.* § 5.02(c)(2)b (emphasis added), and require testing to determine "compliance with the *specified requirements,*" *id.* § 5.02(c)(2)c (emphasis added). By adopting these Specifications, KDOT has severely limited its broad statutory discretion; if a quarry has two consecutive passing samples meeting the technical substantive

---

[8] Indeed, the majority appears to concede that inclusion on the list is governed solely by objective criteria, not KDOT's discretion. *See* Maj. Op. 31 ("We agree with Martin Marietta that KDOT's ability to retest the aggregate and reject it at the project site does not mean that a party's qualifying for a preapproved list *is governed by anything but the Standard Specifications.*" (emphasis added)).

requirements in the Standard Specifications, KDOT must include the quarry on the Approved List. *See id.*

## B. KDOT's procedure for removing a quarry from the Approved List

Just as KDOT has adopted rules and specifications limiting its discretion with respect to inclusion of a quarry on the Approved List, it has adopted rules and specifications similarly limiting its discretion to remove a quarry from the list once that quarry has been prequalified. Specifically, Part V provides that "[a]fter a quarry has been prequalified . . . the prequalified status *will continue* as long as *no major changes* are made in the production process or occur in the deposit characteristics." *Id.* § 5.02(c)(5) (emphasis added); *see also* Std. Specs. § 1101.4 ("Approved sources remain approved only if there are no major changes in the production methods or deposit characteristics."). "Changes in deposit characteristics may be discovered either visually or through test results performed on Production Samples." Part V § 5.02(c)(5).

Importantly, the meaning of the term "major changes" is not left to KDOT's discretion. Rather, a "major change" occurs if (1) a mining operation moves a "significant distance from where the last inventory inspection was made"; (2) "significant changes are observed in the deposit characteristics"; (3) it has been two years since an active quarry was last reinventoried; or (4) "a production sample fails." *Id*.

Only one provision, Part V § 5.02(c)(5), arguably stands in tension with these non-discretionary provisions. It states, "When any party *feels* that any change in the prequalified status of a quarry is *warranted* they should notify the DME responsible for quarry inspection who in turn will advise the Chief of Materials and Research," who will

8

then "review all available information on the changed conditions and *render a decision on any such changes*." *Id.* (emphasis added). Both KDOT and the majority rely, at least to some extent, on Part V § 5.02(c)(5) to conclude that KDOT's discretion is sufficient to destroy Martin Marietta's property interest. For the reasons discussed below, § 5.02(c)(5) just isn't capable of that kind of heavy lifting.

First, KDOT suggests that § 5.02(c)(5) gives it discretion to remove from the Approved List any quarry that, "in its judgment, does not produce a product of sufficient quality." *See* Aplee. Br. 38-39. But interpreting Part V § 5.02(c)(5) to allow KDOT to remove a supplier from the list for any reason whatsoever is inconsistent with the provisions discussed above, which specifically provide that a quarry's "prequalified status *will continue* as long as *no major changes*"—which are specified in Part V and which do not apply here—"are made in the production process or occur in the deposit characteristics." Part V § 5.02(c)(5) (emphasis added).

The majority, on the other hand, concludes Part V § 5.02(c)(5) gives KDOT "discretion to *reject aggregate* if it has 'reason to believe' that the aggregate does not comply with the Contract documents, which include a variety of requirements beyond the Standard Specifications." Maj. Op. 33 (emphasis added). Even assuming the majority is correct, this interpretation renders § 5.02(c)(5) irrelevant to our discussion. The question here is whether KDOT retains discretion to *remove a supplier* from the list—not whether it retains discretion to *reject aggregate*.

Instead, the most natural and reasonable interpretation of the Part V § 5.02(c)(5) is that it permits "any party" to request that the Chief of Materials and Research verify

9

that a quarry, once on the Approved List, continues to meet the requirements for inclusion on that list as spelled out in the Standard Specifications. Thus, Part V § 5.02(c)(5)'s reference to "any change" refers back to the "major changes" specified in that section, which provides, "After a quarry has been prequalified . . . the prequalified status *will continue* as long as *no major changes* are made in the production process or occur in the deposit characteristics." *Id.* (emphasis added); *see also* Std. Specs. § 1101.4 ("Approved sources remain approved only if there are no *major changes* in the production methods or deposit characteristics." (emphasis added)). This interpretation is not only internally consistent but avoids rendering the "major changes" provisions of Part V § 5.02(c)(5) and § 1101.4 of the Standard Specifications meaningless.

Thus, I would hold that KDOT has adopted rules and specifications which limit its discretion to remove a preapproved supplier from the Approved List.[9]

## C.    KDOT's regulations governing the bidding and supply process don't apply to Martin Marietta's asserted property right

Finally, I can't accept the majority's attempt to liken Martin Marietta's asserted property interest to that of a "disappointed bidder" or an incidental third-party beneficiary, both of which generally lack a property interest in a government contract. *See* Maj. Op. 25-26, 37. Neither analogy is apt. The disappointed-bidder cases the

---

[9] KDOT suggests that it "could not perform its legislatively-mandated duties if [its] use of technical specifications was construed to prevent it from exercising discretion to remove materials that do not perform as required." Aplee. Br. 56-57. Once again, this dire prediction misconstrues the issue and misstates the remedy sought. Nothing prevents KDOT from removing a supplier's quarry from the Approved List if the quarry's aggregate no longer meets the criteria in the Standard Specifications, so long as the supplier is afforded due process (e.g., notice and a pre- or post-deprivation hearing) to contest the allegations.

10

majority cites turn on an examination of the particular regulations governing the bidding process, all of which implicitly or explicitly gave the government broad discretion in selecting the winning bid.[10] As discussed, that is not the case here. Similarly, any analogy to third-party beneficiaries of government contracts is also unpersuasive because it assumes Martin Marietta claims a property interest as a result of a provision in a contract between KDOT and a contractor. But Martin Marietta's property interest claim doesn't rely on the existence of a contract; it relies on the requirements detailed in the Standard Specifications. Privity isn't a requirement in this circumstance.

Because KDOT has retained no discretion to exclude or remove a quarry from the Approved List so long as that quarry satisfies the Standard Specifications, I would hold that Martin Marietta has properly asserted a property interest protected by the Due Process Clause of the Fourteenth Amendment.

---

[10] *See, e.g.*, *Glover v. Mabrey*, 384 F. App'x 763, 777 (10th Cir. 2010) (unpublished) (holding no property or liberty interest in being prequalified bidder because prequalified bidder determination is subject to department of transportation's sole discretion); *S. Disposal, Inc. v. Tex. Waste Mgmt., a Div. of Waste Mgmt. of Tex., Inc.*, 161 F.3d 1259, 1265 (10th Cir. 1998) (holding plaintiff had no property interest as a bidder to waste disposal contract because it was never guaranteed the contract); *Curtis Ambulance of Fla.*, 811 F.2d at 1383 (holding plaintiff lacked property interest in contract for ambulance services when procedures provided that defendant "may" enter into a contract for professional services by competitive bidding); *Interior Contractors, Inc. v. Bd. of Trs. of Newman Mem'l Cty. Hosp.*, 185 F. Supp. 2d 1216, 1228 (D. Kan. 2002) (holding Kansas competitive bidding statute requiring certain contracts to go to "lowest and best bid" doesn't confer property right to bidders because standard leaves broad discretion to decisionmaker).

**III.** **Martin Marietta hasn't plausibly stated a liberty interest because it hasn't challenged the district court's defamation holding.**

Martin Marietta also claims a liberty interest in its reputation, specifically a right not to be defamed by government officials in a manner that harms its ability to earn a living or damages its standing in the community. It alleges that by removing its quarries from the Approved List, KDOT announced to the industry that the Ottawa and Sunflower quarries could not be trusted to produce acceptable concrete. The district court dismissed Martin Marietta's liberty interest claim, at least in part, because it held that Martin Marietta couldn't establish a property interest.

The majority affirms the district court's dismissal of Martin Marietta's liberty interest claim on substantive grounds. But as KDOT points out, Martin Marietta hasn't appealed the district court's judgment with respect to the state law defamation claim. *See* Mem. & Order, Doc. 59, at 44-47 (dismissing Martin Marietta's defamation claim for failure to state a claim because Kansas doesn't recognize the tort of product disparagement); Aplee. Br. 51 (noting that "Martin Marietta has not appealed the district court's determination that it does not have a valid defamation claim and that determination is now the law of the case.").[11] Thus, because Martin Marietta hasn't alleged an actionable defamation claim that could give rise to a protected liberty interest, I concur with that portion of the majority's decision affirming the dismissal of Martin Marietta's procedural due process claim based on an asserted liberty interest.

---

[11] In its reply, Martin Marietta doesn't challenge KDOT's assertion that the district court's defamation holding is now the law of the case. Rather, Martin Marietta simply reiterates its argument that it plausibly alleged defamation in its complaint. *See* Aplt. Reply Br. 11-13.